**Anthony LEE, an individual, Plaintiff,**

v.

**AMERICAN EAGLE AIRLINES, INC., Defendant,**

**No. 97–0722–Civ.**

United States District Court, S.D. Florida, Miami Division.

March 15, 2000.

---

Marvin Kurzban, Ira Jay Kurzban, Kurzban Kurzban Weinger & Tetzeli, Miami, FL, for plaintiff.

Terence G. Connor, Laura F. Patallo, Morgan Lewis & Bockius, Miami, FL, for defendant.

## ORDER ON ATTORNEY'S FEES AND COSTS

MIDDLEBROOKS, District Judge.

This Cause came before the Court upon Plaintiff's Amended Verified Motion for Attorney's Fees and Costs, filed November 4, 1999 (DE# 310). The Court has reviewed the pertinent portions of the file and is otherwise fully informed in the premises.

### I. Introduction

"Let's kick some ass," Marvin Kurzban said loudly to his client, Anthony Lee, and his co-counsel, Ira Kurzban. I had taken the bench, and Court was in session. Opposing counsel and their client representatives were seated across the aisle. The jury was waiting to be called into the courtroom. Mr. Kurzban's comment was suited more to a locker room than a courtroom of the United States, and the conduct of Plaintiff's counsel that followed disrupted the adversary system and interfered with the resolution of a civil dispute.

The trial of this case lasted approximately fourteen days. The jury found that American Eagle Airlines had subjected Mr. Lee to a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. As compensation, the jury awarded Mr. Lee $300,000. In addition, the jury awarded Mr. Lee $650,000 in punitive damages. The jury denied Mr. Lee's other claim, also premised on Title VII and § 1981, finding that Mr. Lee had not been terminated because of his race. This motion seeking attorney's fees and costs pursuant to 42 U.S.C. § 1988 followed.[1]

As the prevailing party in a Title VII action, the Plaintiff now seeks $1,611,910.50 in attorney's fees. This request presents the question of whether unprofessional and disruptive conduct of counsel which prolongs the proceedings and creates animosity which interferes with the resolution of a cause can be considered in determining an award of attorney's fees.

In their post-trial motions, counsel for the parties filed opposing affidavits concerning additional misconduct that was not directly observed by the Court. Since these affidavits presented vastly different versions of events, an evidentiary hearing was held; counsel and other witnesses testified.

These issues have been distasteful and time consuming. There is a great temptation to simply move on and ignore the issue. It is unpleasant to hear lawyers accusing each other of lies and misrepresentations. Unprofessionalism on the part of lawyers is a distraction and takes time away from other pending cases; it also embroils the Court in charges and counter charges. However, the functioning of our adversary system depends upon being able to rely upon what a lawyer says. So, confronted by affidavits of counsel that

---

1. The Court notes that 42 U.S.C. § 2000e–5(k) governs the award of attorney's fees to prevailing Title VII plaintiffs, while 42 U.S.C. § 1988 governs such awards to plaintiffs prevailing under § 1981. Because these attorney's fees provisions contain identical language and because their standards for awarding fees are generally the same, *see e.g., Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Court need not engage in two attorney's fees analyses. Rather than referring to Title VII or § 1981, the Court refers to "civil rights actions."

were directly contradictory, I decided to hear testimony and make credibility findings. These findings are based upon direct observations by the Court, the transcript of the trial, and the evidentiary hearing.

In addition, we contacted the Florida Bar to determine whether counsel had been the subject of complaints regarding unprofessional conduct. The Florida Bar forwarded a record of a previous complaint by a state court judge concerning the conduct of Marvin Kurzban. In response to that complaint, and immediately before the trial in this cause, the Florida Bar had directed Mr. Kurzban to attend an ethics class and pay a fine.

## II. Findings of Fact Pertaining to Misconduct by Counsel

Discovery in this case was rancorous from the beginning. As is often the case, counsel for both sides contributed to the lack of civility. The tone of depositions was harsh, witnesses were treated with discourtesy, and discovery disputes were abundant. The transcripts of the depositions in this case are weighted down with bitter exchanges between the lawyers. (*See, e.g.,* Dep. of Raphael Perez, at 120–121, 161–164; Dep. of German Agosto at 22–28.)

Testimony at the evidentiary hearing reflected that this uncivil conduct also continued during conversations between counsel. The testimony of a young lawyer formerly with the Defendant's counsel's law firm was particularly poignant. This lawyer testified that during telephone conversations with Ira Kurzban, she was hung up on, told that she had only been assigned to work on the case because she was African–American, and wrongly accused of misrepresentations. She testified that her experience with opposing counsel in this case was a factor in her decision to leave her litigation practice.

This testimony was not only powerful and credible, but it also reflects the corrosive impact this type of unprofessional behavior can have upon the bar itself. A litigation practice is stressful and often exhausting. Unprofessional litigation tactics affect everyone exposed to such behavior and the ripple effect of incivility is spread throughout the bar.

The trial began. Testimony at the evidentiary hearing reveals that Mr. Kurzban's "Let's kick some ass" comment was not an aberration. A client representative of the Defendant, a lawyer for American Airlines, testified that she and others were subjected to a barrage of comments out of the hearing of the Court and jury which she likened to trash talk at a sporting event. Local counsel for the Defendant was called a "Second Rate Loser" by Marvin Kurzban. She testified that each day as court began, Marvin Kurzban would say, "Let the pounding begin." In front of defense counsel's client, Mr. Kurzban would ask, "How are you going to feel when I take all of your client's money?" When walking out of the courtroom, Marvin Kurzban would exclaim, "Yuppies out of the way."

Other than Mr. Kurzban's opening comment, I was unaware of this conduct towards opposing counsel and their client's representatives, although counsel for the Defendant alluded to it during the trial. (Tr. 477). However, I observed continuing misconduct during the trial itself.

Early in the trial, an episode occurred when defense counsel brought to the Court's attention that after an instruction to a witness not to discuss his testimony during a break in his testimony for lunch, Ira and Marvin Kurzban had approached the witness and had a discussion—with an open deposition transcript in hand. Marvin Kurzban responded, "That's a lie." The Kurzbans then explained that they had the transcript open because they were looking at it, but that they were not talking with the witness about it. Their explanation was that they were talking about where they were going for lunch. I accepted the explanation, but with the obser-

vation that it was an exercise of poor judgment. (Tr. 324–325).

Shortly afterward, Marvin Kurzban objected to a question, and I overruled his objection. He continued to argue his point, then he visibly expressed his dismay with the ruling. I asked counsel to approach for a sidebar conference, wherein I advised him that for the third time he had made visible displays of disagreement with rulings by nodding his head or looking upward at the ceiling. I told him to stop that conduct and to cease making speaking objections. (Tr. 351–352).

Subsequently, I warned both counsel again; once before the jury (Tr. 571–572), and again at the close of the mornings testimony. (Tr. 578–583). Ira Kurzban responded that he was way beyond acrimony with opposing counsel.

After this warning, defense counsel followed the Court's admonition and refused to respond to provocations from opposing counsel. Later than day, Marvin Kurzban interrupted an appropriate cross-examination and requested a sidebar to accuse counsel of intentionally delaying the examination so that he could not reach a witness. (Tr. 678).

Despite repeated warnings, Plaintiff's counsel continued to address comments to opposing counsel rather than to the Court (Tr. 263; 292; 487; 871) and interject inappropriate comments before the jury. (Tr. 913; 1073; 1693–1694; 1729; 1753–54; 2002; 2240).

The belligerence of Plaintiff's counsel, particularly Marvin Kurzban, spread like a contagion through the courtroom. On September 22, 1999, I returned to the bench after a luncheon break. Marvin Kurzban wanted to raise a matter prior to the jury's return.

Mr. Kurzban stated:

I am concerned about the record, Your Honor. I went over to the ... Mr. Reporter there, when we took the first break, and asked him about the ability to get a page typed. And instead I ended up having names called at me and a confrontation. I only bring it to the Court's attention because I am concerned about the record being clear. I feel this Court Reporter for whatever reason ... I don't know the gentlemen, never met him before—is either unstable based on his reaction and not competent to be reporting or has some bias. (Tr. 1161).

At the next recess, I asked the Court Reporter what had happened. He indicated that at the break, which was a brief break for him inasmuch as we had a calendar call scheduled during that luncheon break, Marvin Kurzban asked him for a portion of transcript. The reporter responded that he could not produce those pages over the break (because he had to report the calendar call). Marvin Kurzban responded, "What are you here for, just to look pretty?" The Court Reporter responded with an epithet, at which point Marvin Kurzban remarked, "We're not talking about your family." Then Mr. Kurzban said, "I guess money talks," suggesting that since the Defendant was ordering daily copy, the reporter was biased in their favor. At that point, the Court Security Officer intervened.

I required the Court Reporter to apologize for his behavior. Because of the accusation of bias, I arranged for other Court Reporters to cover the remainder of the trial.

I learned that accusations of bias followed any disagreement with positions espoused by Plaintiff's counsel: "There's no question that he's entitled to it, so it's no— if I understand what Your Honor's saying, you don't want it to go in front of the jury for whatever reason." (Tr. 313). "Your Honor, I know you're angry at me, but I hope you're not taking it out on my client." (Tr. 1337). "In fact, I think that the Court has exhibited extreme bias in this case and your rulings on objections." (Tr.1984). "Well, Your Honor, I respectfully disagree with you, that's for a court of appeals

ultimately to decide, but to put a motive on it I think it exhibits a substantial amount of bias on behalf of Your Honor." (Tr. 1985). "And I concur with what my brother has said. There's been clear animous by this Court to this side." (Tr.1989). "I've practiced 26 years and I've tried over 50 cases, and I've won multimillion dollar verdicts on more than a dozen cases. I don't need for this Court to allow a witness to have his wife introduced. I can't think of any reason or purpose, other than prejudice, that this Court would allow such an act to occur." (Tr. 2104).

Disturbing behavior by both Marvin Kurzban and Ira Kurzban occurred repeatedly during the trial. When confronted about their conduct, they would deny that which I had just observed and then lash out in a personal attack. For instance, after I overruled an objection made by Ira Kurzban, Marvin Kurzban laughed. (Tr. 2149). Other examples of their conduct following rulings include Marvin Kurzban tossing a pen; Ira Kurzban exclaiming, "This is outrageous"; the rolling of eyes; exasperated looks at the ceiling; and flailing of arms. I warned counsel about this behavior. (Tr. 1829).

After the episode of Marvin Kurzban laughing at my ruling, I asked counsel to approach the bench. Marvin Kurzban responded: "I didn't laugh. What I started doing was writing a note, saying to my brother ... I didn't realize I was saying it out loud—we're not trying his case. That's what the objection was, because he's telling about his problems." Ira Kurzban then interjected: "I'd like to add, Your Honor, there's a continuing pattern of conduct we believe shows enormous bias and has turned this trial into a circus-like atmosphere." (Tr. 2149).

Ira Kurzban then listed a litany of complaints about rulings which he stated should result in a mistrial. (When offered a mistrial, the Plaintiff declined.) (Tr. 2141–2152). Defense counsel and the Court Security officer also heard a laugh. (Tr. 2153, 2210).

Shortly thereafter, during a discussion between the Court, Marvin Kurzban, and defense counsel about the admissibility of an exhibit a witness had allegedly drawn during a videotaped deposition but which was not on the Plaintiff's exhibit list, Ira Kurzban walked to the video machine and begin playing the videotape of the deposition in front of the jury. I directed that the machine be turned off and we took a fifteen minute break. (Tr. 2202).

After the break, defense counsel raised the issue and requested some sanction. I asked Ira Kurzban for an explanation. He responded:

> Mr. Kurzban: Yes, Your Honor. First, Mr. Connor asked me not to tamper with the tape now, because you were going to come out and rule. I assume he didn't have any ex parte communication with you. I'm a little perturbed about the fact that somehow he knew you were coming out to make a ruling, which I was totally unaware.

> The Court: I think he knew that I was coming back after a 15 minute break. There has been absolutely no contact between me and Mr. Connor or any other lawyer in this case between the time I left the bench 15 minutes ago and when I returned now. Now, is there some reason why you would make that accusation?

> Ira Kurzban: Yes, Your Honor.

> The Court: All right. What was it?

> Ira Kurzban: Mr. Connor said the Judge is going to come out here, he's going to impose some sanction. That's what Mr. Connor said, Your Honor, you are not here.

> I'm simply saying that's what Mr. Connor did. I'm not accusing you of anything. We can have the marshal testify that I should not touch the tape because you were going to impose sanctions.

> The Deputy: No, no.

The Court: The marshal is nodding no. Mr. Marshal?

The Deputy: No mention of sanctions was ever made.

(Tr. 2205).

Mr. Kurzban then stated that he had put the tape into the machine so that it would be ready if needed and that the tape began playing accidentally. I accepted his explanation but stated:

> [I]f I can't rely on lawyers being able to respect each other and be respected and accept what other people say in the courtroom, this system can't work. It's as important to me as whether or not you have a law degree.... I'm beginning to really have a problem with what you are telling me is happening, based on what I'm seeing and what others in the courtroom are seeing. So you all really need to think about that.

(Tr. 2210).

During a cross-examination concerning how much time the witness spent on various shifts, Marvin Kurzban held a file towards the witness and asked:

> Marvin Kurzban: I have your personnel file (indicating). How many times did you have to work between 1992 and 1994, sir? Do you think it was more than a handful of times?

(Tr. 1868–1869).

After an objection, and out of the presence of the jury, I asked Mr. Kurzban for the witness's personnel file. (Tr. 1876). He responded:

> Marvin Kuzban: Actually, we do have Mr. Blades's personnel file, when it was produced among all the other personnel files in Miami of the people. I don't know if that box is here or I left it in the office. I think the personnel files that we were given by counsel is in the office.
>
> The Court: So it wasn't in the folder that you picked up and carried to the stand?

Marvin Kurzban: No it wasn't, Your Honor.

The Court: You said, "Mr. Blades, we have your personnel file here!"

> \* \* \* \* \* \*

The Court: You believe it is permissible to pick up a file from your desk, carry it to the witness stand and tell the witness "Mr. Blades, we have your personnel file," and then begin questioning him? You believe that's appropriate court examination?

Marvin Kurzban: I do, on hostile witnesses; on cross-examination, I believe that I'm entitled to have that witness believe I'm going to question him on something whether or not I have that in my hand or not. Yes, I do.

> \* \* \* \* \* \*

The Court: I believe, frankly, that it is inappropriate to make a deliberate misrepresentation to a witness or to ask, implying in your questioning something that is not true.

Marvin Kurzban: Neither was I implying something that wasn't true, nor was I making a misrepresentation. The question was about how many times he worked, Your Honor. The question wasn't: In your personnel file it says something. I didn't make any such misrepresentation.

(Tr 1877–1878).

Mr. Kurzban insisted that he had the personnel file back at his office. He was asked to produce it and he responded that he would the following day. The file was never produced.

At the end of the trial, defense counsel Connor approached Ira Kurzban and offered his hand in congratulations. Mr. Kurzban refused to shake his hand. The trial ended much like it had begun.

At the evidentiary hearing, Plaintiff's counsel were unrepentant, attacking opposing counsel and accepting no responsibility for their own actions. They argued

that the perceived misconduct was only a matter of style and the exercise of first amendment rights. In keeping with that "style," Marvin Kurzban ended the hearing with the proclamation that he had called his opponent a loser, but not a second-rate loser because, "I don't rate losers." Mr. Kurzban's testimony reflects that he has no clue about what it means to be a lawyer.

## III. Analysis

Courts presiding over civil rights actions may, in their discretion, award the prevailing party[2] a "reasonable attorney's fee (including expert fees)" as part of its costs. *See* 42 U.S.C. § 1988; 42 U.S.C. § 2000e–5(k). Although the presiding court has discretion, a prevailing plaintiff is to be awarded attorney's fees "in all but special circumstances." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *see also New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 63, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980); *Dowdell v. City of Apopka, Florida*, 698 F.2d 1181, 1190–91 (11th Cir.1983). This presumption in favor of awarding attorney's fees is a reflection of Congress' clear intent to "cast the Title VII plaintiff in the role of 'a private attorney general,' vindicating a policy of the highest priority." *Christiansburg Garment*, 434 U.S. at 417, 98 S.Ct. 694. By awarding prevailing plaintiffs their attorney's fees, the section "make[s] it easier for a plaintiff of limited means to bring a meritorious suit." *Id.* at 420, 98 S.Ct. 694 (quoting 110 Cong.Rec. 12724 (1964) (remarks of Sen. Humphrey)).

Courts determining attorney's fee awards begin by determining the "lodestar": the product of the number of hours reasonably expended on the litigation and a reasonable hourly rate for the attorney's services. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *American Civil Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 427 (11th Cir.1999); *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir.1994). This lodestar may then be adjusted for the results obtained. *See Eckerhart*, 461 U.S. at 435–3, 103 S.Ct. 19337; *Barnes*, 168 F.3d at 427; *Loranger*, 10 F.3d at 781; *Norman v. Hous. Auth.* 836 F.2d 1292, 1302 (11th Cir.1988).

### 1. The reasonable hourly rate

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Loranger*, 10 F.3d at 781 (quoting *Norman*, 836 F.2d at 1299) (citing *Blum v. Stenson*, 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541 (1984)). The party seeking attorney's fees, in this case Mr. Lee, bears the burden of producing "satisfactory evidence that the requested rate is in line with prevailing market rates." *Id.* To be satisfactory, evidence must consist of "more than the affidavit of the attorney performing the work." *Id.*

■ Prior to adoption of the lodestar formula, the so-called *Johnson* factors" governed fee awards. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).[3] Although the

---

**2.** Defendant does not dispute Plaintiff's "prevailing party" status, nor can it, for Plaintiff achieved some of the benefit he sought by filing suit. *See Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. Defendant does, however, argue that Plaintiff's fees should be reduced to reflect that he was not successful on all his claims. *See* Dft's Resp. at 7. We address that argument *infra*.

**3.** The twelve *Johnson* factors are as follows: (1) the time and labor required;

(2) the novelty and difficulty of the questions;

(3) the skill requisite to perform the legal service properly;

(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

lodestar formula has since displaced the "*Johnson* factors," the Eleventh Circuit has permitted district courts to consider the factors in establishing a reasonable hourly rate. *See Loranger,* 10 F.3d at 781 n. 6. Among those factors is the experience, reputation, and ability of the attorneys and the skill requisite to perform the legal service properly. *See Johnson,* 488 F.2d at 717–19. As explained more fully in the findings of misconduct, contained in Section II, *supra,* the conduct of Ira Kurzban and Marvin Kurzban both during and prior to trial was very troubling. In my estimation, the manner in which a lawyer interacts with opposing counsel and conducts himself before the Court is as indicative of the lawyer's ability and skill as is mastery of the rules of evidence. Upon review of the trial transcripts and the evidence presented during the evidentiary hearing on attorney conduct and based on observations at trial, I find that the conduct of Ira Kurzban and Marvin Kurzban in the litigation of this case fell far below acceptable standards, especially in light of the $300 hourly rate the attorneys claim. Accordingly, I find "special circumstances" justifying a departure from counsels' requested rates: Ira Kurzban shall be awarded $150 per hour for his pretrial work and $0 for his trial work; Marvin Kurzban's rate for this action is $0. *Cf. Chaney v. New Orleans Pub. Facility Management, Inc.,* 1998 WL 87617 (E.D.La. Feb.20, 1998) (denying prevailing party attorneys' fees in Title VII action,

finding performance of plaintiff's attorneys did not merit attorneys' fees).[4]

For further support of the above rate reductions, we rely upon our "inherent power" to sanction attorney misconduct. "It is well-established that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.' For this reason, 'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.' These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (internal citations omitted).

Among these powers is the contempt sanction, "which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court...." *Id.* (quoting *Cooke v. United States,* 267 U.S. 517, 539, 45 S.Ct. 390, 69 L.Ed. 767 (1925)). "The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it," *Kleiner v. First Nat'l Bank of Atlanta,* 751 F.2d

---

(9) the experience, reputation, and ability of the attorneys;
(10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). At one time courts considered these factors, rather than applying the loadstar formula, in fashioning a reasonable hourly rate. Though the Eleventh Circuit has displaced the *Johnson* factors with the lodestar formula, it permits district courts to consider these factors in determining a reasonable hourly rate. *See Loranger,* 10 F.3d at 781 n. 6.

4. The Court could also have elected to reduce the hours billed by Ira Kurzban and Marvin Kurzban to account for their misconduct. *See Luciano v. Olsten Corp.,* 109 F.3d 111, 116–117 (2d Cir.1997); *Rivera v. Baccarat, Inc.,* 1999 WL 294874, *3 (S.D.N.Y. May 10, 1999); *Greenbaum v. Svenska Handelsbanken, N.Y.,* 998 F.Supp. 301, 305 (S.D.N.Y.1998). However, because their misconduct was so pervasive and not readily accounted for by reference to hours billed, the Court instead reduces their billable rates as indicated in the text.

1193, 1209 (11th Cir.1985) (quoting *Flaksa v. Little River Marine Constr. Co.*, 389 F.2d 885, 888 (5th Cir.1968)).

■ A finding that counsels' conduct "constituted or was tantamount to bad faith" must precede any sanction levied pursuant to a court's inherent powers. *See Roadway Express*, 447 U.S. at 767, 100 S.Ct. 2455; *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir.1998). The Court of Appeals for the Second Circuit requires that bad faith be shown by (1) "clear evidence" or (2) "harassment or delay or . . . other improper purposes." *DLC Management* (quoting *United States v. International Brotherhood of Teamsters*, 948 F.2d 1338, 1345 (2d Cir.1991)). Where imposed for the purpose of deterring misconduct rather than remedying some prejudice, as here, the District of Columbia Circuit has held that sanctions must be supported by "clear and convincing evidence" of "flagrant or egregious misconduct." *Bonds v. District of Columbia*, 93 F.3d 801, 809 (D.C.Cir.1996); *Shepherd v. American Broad. Cos.*, 62 F.3d 1469, 1478 (D.C.Cir.1995). Before imposing a severe sanction based on principles of deterrence, a district court must consider whether a lesser sanction is more proportionate to the misconduct. *See id.*

In this case, we are imposing a lesser sanction. We did not dismiss this case, but rather permitted it to go the jury. Moreover, although counsel were warned during the trial that further disruptive conduct would be a basis for criminal contempt, that sanction was not employed. We have also elected not to deny Plaintiff's fee request altogether, though we are reducing it significantly. *Cf. Kleiner*, 751

F.2d at 1209 ("Since misconduct by a party courts the risk of outright dismissal, lesser sanctions undoubtedly attend the court's inherent power to discipline intentional attorney misconduct. . . ."). Additionally, our sanction is supported by "clear and convincing" evidence of "flagrant or egregious" misconduct demonstrating counsels' "bad faith." In assessing attorney misconduct, the Court had the benefit of an exhaustive evidentiary hearing concerning attorney misconduct and trial transcripts replete with examples of unprofessional behavior. Most significantly, much of the misconduct in this matter occurred before the Court. Plaintiff's counsels' continued misbehavior in the face of repeated verbal reprimands and warnings that the Court intended to revisit counsels' misconduct at a later date demonstrated counsels' "bad faith."

There is precedent for denying a party attorney's fees to which it was otherwise statutorily entitled as a sanction for attorney misconduct. In *Litton Sys., Inc. v. American Tel. and Tel. Co.*, 700 F.2d 785 (2d Cir.1983), the Second Circuit Court of Appeals affirmed the district court's denial of attorney's fees to a prevailing plaintiff in an antitrust suit. The plaintiff was entitled to its costs and fees under, among other provisions, the Clayton Act, 15 U.S.C. § 15. *See Litton*, 700 F.2d at 826—27. Though the *Litton* court based its decision on its power to sanction disobedience of court orders under Federal Rule of Civil Procedure 37(b), it noted that "[g]iven the court's express findings of bad faith, it could also have imposed sanctions on [the plaintiff] as an exercise of its inherent powers." *Id.* at 827.[5]

---

5. In case a reviewing court finds that we have abused our discretion, we continue our analysis, reducing Messrs. Kurzbans' rates based on Plaintiff's failure to provide "satisfactory evidence" demonstrating that their request "is in line with prevailing market rates." *See Loranger*, 10 F.3d at 781. The statements of Ira Kurzban and Marvin Kurzban and Robert Sussman, who were the attorneys who performed the work, are not satisfactory evidence. *See id.* Nor are the conclusory statements contained in the affidavit of James K. Green and the unsworn declaration of William R. Amlong, attesting to the Kurzbans' abilities as lawyers.

The only indication that $300 is the prevailing rate for such litigation in the Southern District comes from Mr. Amlong's recitation of fees he has received. In three employment discrimination cases, Mr. Amlong has been awarded fees at a rate of $300. *See Gupta v.*

■ In addition, the Court reduces the rates sought by Plaintiff for associate work. Magistrate Judge Barry L. Garber recently found, by order dated May 5, 1999, that $125 was a reasonable hourly rate for associates in *Faragher v. City of Boca Raton.*[6] In *Gupta v. Florida Bd. of Regents,*[7] Magistrate Judge Stephen T. Brown, in a recommendation dated August 17, 1999, noted that the parties agreed to an hourly rate of $125 for associates. Accordingly, the Court finds that $125 is the prevailing hourly rate in the Southern District for associate work. Thus, the work of Brian Torres, Raquel Libman, Jed Kurzban, and Florence Zolin shall be billed at a rate of $125 per hour. Peter Hoffer, who has eight years of civil rights litigation experience, shall be billed at $175.

2. The number of hours reasonably expended

Defendant argues that not all of the 3,269.54 hours claimed by Plaintiff were "reasonably expended." Specifically, Defendant contends that Plaintiff claims hours from another case, which are not

*Florida Bd. of Regents,* Case No. 96–6690–CIV–MOORE; *Faragher v. City of Boca Raton,* Case No. 92–8010–CIV–HIGHSMITH; *Tuttle v. City of N. Miami Beach and John Bergacker,* Case No. 95–710–CIV–MORENO. In contrast to Ira and Marvin Kurzban, however, Mr. Amlong's resume certifies him as a specialist in the area of employment discrimination. As Mr. Amlong indicates, Ira Kurzban is primarily known as an immigration lawyer and does not specialize as narrowly in labor and employment law as does Mr. Amlong. Amlong decl. at ¶ 8. And, tellingly, Mr. Amlong was not familiar with the other lawyers at Kurzban, Kurzban, et al., including Marvin Kurzban. Were Ira and Marvin Kurzban more experienced in employment discrimination matters, Mr. Amlong certainly would have referred to specific cases or otherwise so indicated.

Convinced that Ira and Marvin Kurzban were litigating in an area outside their expertise, the Court declines to award them fees at the prevailing rate of an employment discrimination specialist. *See Greenbaum,* 998 F.Supp. at 304. Putting aside their conduct, the Court finds that Ira Kurzban's and Marvin Kurzban's reputation, skill, and experience

compensable in this matter, and that Plaintiff did not exercise proper billing judgment.[8]

i. Hours spent on another case

Defendant points out that although Plaintiff initiated the action before this Court on March 21, 1997, Plaintiff has submitted time records with dates as early as August 1994. Dft's Resp. at 5. Defendant surmises that many of these entries are for work done on other cases and thus are not compensable. *Id.; See* Tab 2 attached to Steinberg aff. for list of these entries. Plaintiff replies that the Kurzban firm had begun representing Mr. Lee in 1994, before the firm's formal retention by Mr. Lee and commencement of this action, and that the work underlying these entries was the basis for Plaintiff's hostile environment claim. Pltf's Reply at 8; Supp. aff. of Ira Kurzban at ¶ 2. Initially, Ira Kurzban represents that he advised Mr. Lee and other black mechanics at American Eagle who complained of racism at American Eagle, then Flagship Airlines. Supp. aff. of Ira Kurzban at ¶ 2. Thereafter, Mr.

support hourly rates of $275 and $250, respectively. Considering their conduct, which reflects upon their skills and abilities as exhibited in this case, the Court would reduce their rates to $250 and $225, respectively. *See Johnson,* 488 F.2d at 717–19.

The Court notes that we did not consider that Plaintiff's counsel accepted this case on a contingency fee basis in setting counsels' reasonable rates, as requested by Plaintiff and recommended by Mr. Green. *See* Pltf's Mem. in Support of Fees and Costs at 7 – 8; Green aff. at ¶ 11. To consider this factor would be to double count considerations already subsumed in the lodestar. *See City of Burlington v. Dague,* 505 U.S. 557, 562–63, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *McKenzie v. Cooper, Levins & Pastko, Inc.,* 990 F.2d 1183, 1186 (11th Cir.1993).

6. Case No. 92–8010–CIV–HIGHSMITH.

7. Case No. 96–6690–CIV–MOORE.

8. Defendant also argues that Plaintiff cannot claim hours spent on unsuccessful claims. We deal with this issue in our discussion of the "results obtained."

Kurzban assisted Plaintiff in his negotiations with American Eagle and in his claims before the Equal Employment Opportunity Commission (EEOC). *Id.*

Kurzban, Kurzban et al. may collect fees for legal services it provided Mr. Lee prior to commencement of this action or its formal retention by Mr. Lee. *See New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) (awarding fees for work done by prevailing Title VII plaintiff in state administrative and judicial proceedings); *see also Dowdell v. City of Apopka, Florida,* 698 F.2d 1181, 1188 (11th Cir.1983) (awarding fees for time spent prior to formal commencement of the lawyer-client relationship). Defendant does not seem to contest this, but rather asks the Court to strike those hours it claims were clearly not spent on matters related to this case. Dft's Resp. at 6 n. 3.

■ We begin by striking those entries, dated prior to the commencement of this action, that appear to relate to motions practice and other matters in a pending lawsuit or which do not seem sufficiently related to this action. These entries add up to 137.15 hours. *See* Appendix A attached to this Order. In addition, the Court reduces by 50% the remaining hours claimed between August 10, 1994 and January 2, 1997.[9] *See Loranger,* 10 F.3d at 783 (permitting across-the-board percentage cuts in the number of hours claimed where a fee application is voluminous). We find Plaintiff's documentation to be inadequate for purposes of demonstrating that these hours were reasonably expended in the litigation of this matter. *See Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. While the information gathered at this stage was likely helpful in the eventual litigation of Mr. Lee's claims, the information was being gathered for other purposes. Accordingly, the Court is not convinced that all the time claimed, or even most of it, was reasonably expended in the pursuit of Mr. Lee's claims.

ii  Billing judgment

Fee applicants must exercise "billing judgment." *Barnes,* 168 F.3d at 428 (quoting *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933). That means that they must exclude from their fee applications "excessive, redundant, or otherwise unnecessary [hours]," which are hours "that would be reasonable to bill to a client and therefore to one's adversary irrespective of the skill, reputation or experience of counsel." *Id.* (internal citations omitted). Defendant maintains that further reductions are warranted based on Plaintiff's counsels' time and record keeping practices. Vague entries, according to Defendant, preclude the Court from determining that hours were reasonably expended, and cannot be cured by Plaintiff's counsel's *post hoc,* hand-written notes.[10] Defendant also contests counsels' repetitious charges, claims for hours spent by attorneys "getting up to speed," and excessive time spent on certain activities.

While wary of counsels' after-the-fact, clarifying notes, the Court does not ignore the added detail and takes counsel at their word that the additions are supported by reference to red books, pertinent files, and their own memories. Pltf's Reply at 15. The Court is more concerned about the excessive number of hours billed in this case in light of its nature. This case involved racial harassment endured by a single plaintiff at a single site of employment. Although this matter was hotly contested, due in large part to overzealousness on both sides, the $1,611,910.50 in fees sought by Plaintiff's counsel based on 3,269.54 hours is clearly excessive. This view is supported by a review of recent awards in

**9.** The Court chooses the entry for January 2, 1997 as the cutoff date because the next entry, dated February 4, 1997, seems clearly related to the action before the Court.

**10.** Plaintiff's counsel wrote in hand-written notes next to time entries, at James Green's suggestion, to add further detail. Pltf's Reply at 15.

employment discrimination cases in the Southern District, which the Court may consider under *Johnson*. *See* note 3 *supra*. This case was not so much more lengthy or complex than these cases to justify such a grossly disproportionate award.[11] Indeed, in *Commella v. City of Hollywood*, Case No. 94–6468–CIV–HURLEY, Judge Hurley, following a eight-day trial, awarded $191,524.75 in attorneys' fees. The award followed a jury verdict in favor of the plaintiff on her sexually hostile work environment and retaliation claims.

■ To account for the excessive number of hours claimed in this case, we reduce Plaintiff's counsels' hours by 40% across-the-board. *See Loranger*, 10 F.3d at 783 (permitting across-the-board percentage cuts in the number of hours claimed where a fee application is voluminous). In addition, the Court reduces by one-third Ira Kurzban's non-contemporaneous October 8, 1998 entry, allotting 30 hours to the reading of "all new 11th Circuit cases on employment discrimination related to case" over the past six months.

### 3. The lodestar figure

#### i. Reasonable hours

For the period August 10, 1994 to January 2, 1997, after deleting hours unrelated to this litigation, the Court recognizes 106.4 hours. We then reduce that figure by 50%, as explained above, for Plaintiff's failure to establish that those hours were

spent on matters sufficiently related to this litigation, leaving 53.2 hours. All but one of these hours was billed to Brian Torres or Raquel Libman; the other hour was billed to Ira Kurzban. For the period January 2, 1997 to September 14, 1999, the date the trial began, we recognize the following hours: 1,879.85 hours [12] for Ira Kurzban; 682.24 hours for Raquel Libman; 669.2 hours for Peter Hoffer; 28.6 hours for Jed Kurzban; and 12 hours for Florence Zolin. Finally, for the trial period, we credit 81.7 hours to Jed Kurzban.

Next the Court cuts counsels' hours by 40% across-the-board for the period January 2, 1997 through trial, having found, upon review of counsels' billing records and other employment discrimination cases in the District, counsels' claimed hours to be excessive:

- Ira Kurzban: 1,879.85 × .6 = 1,127.91 hours
- Raquel Libman: 682.24 × .6 = 409.34 hours
- Peter Hoffer: 669.2 × .6 = 401.52 hours
- Jed Kurzban: (28.6 + 81.7) × .6 = 66.18 hours
- Florence Zolin: 12 × .6 = 7.2 hours

#### ii Multiplied by the reasonable hourly rates

| | | |
|---|---|---|
| Associates: | 534.92 [13] × $125 = | $66,865 |
| Peter Hoffer: | 401.52 × $175 = | $70,266 |
| Ira Kurzban: | 1,128.91 [14] × $150 = | $169,336.50 |
| Final lodestar: | **$306,467.50** | |

### 4. The results obtained

As noted above, the lodestar may then be adjusted for the results obtained. *See Hensley*, 461 U.S. at 435–37, 103 S.Ct. 1933; *Barnes*, 168 F.3d at 427; *Loranger*, 10 F.3d at 781; *Norman v. Hous. Auth.* 836 F.2d 1292, 1302 (11th Cir.1988). This

11. Defendant cites recent employment discrimination cases in the Southern District where courts awarded attorney fees of between $32,765 and $191,524.75: *Mallory v. Harkness*, 923 F.Supp. 1546 (S.D.Fla.1996) (fee award of $32,765); *Moreland v. Mrs. Fields Cookies*, Case No. 93–1418–CIV–GRAHAM (fee award of $36,849 following four-day trial); *Kidwell v. City of Hialeah Gardens*, Case No. 97–2487–CIV–HIGHSMITH (fee award of $74,944.50 following a five-day trial); *Tuttle v. City of N. Miami*, Case No. 95–710–CIV–MORENO (fee award of $96,250 following five-day trial); and *Commella v. City of Hollywood*, Case No. 94–6468–CIV–HURLEY (fee award of $191,524.75 following eight-day trial).

12. As noted previously, the Court reduced Mr. Kurzban's October 8, 1998 entry from 30 hours to 10 hours.

13. This figure is based on the following calculations: 52.20 (associate hours pre-January 2, 1997) + 409.34 (Raquel Libman) + 66.18 (Jed Kurzban) + 7.2 (Florence Zolin).

14. To arrive at this figure we added the one hour attributed to Mr. Kurzban for the pre-January 2, 1997 period to the 1,127.91 hours Mr. Kurzban billed between January 2, 1997 and trial.

factor is particularly important where, as here, Plaintiff is deemed "prevailing" even though he succeeded on only one of his claims for relief. *See Hensley,* 461 U.S. at 434, 103 S.Ct. 1933.

■ The Court finds that as in many civil rights cases, Plaintiff's claims involve a common core of facts and related legal theories. *Id.* at 435, 103 S.Ct. 1933. Accordingly, the Court does not treat Plaintiff's suit as a series of discreet claims, readily separated for purposes of apportioning hours between prevailing and non-prevailing claims. *Id.* Rather, the Court focuses on the overall results achieved by Plaintiff in relation to the hours reasonably expended by Plaintiff's counsel on the litigation. *Id.* Having done this, the Court finds that Plaintiff achieved only limited success, rendering the product of the hours reasonably expended on the litigation as a whole and the reasonable hourly rates an excessive fee recovery. *Id.* at 436, 103 S.Ct. 1933. While Plaintiff's recovery on his hostile environment claim was significant, he was unable to convince the jury that he had been discharged based on his race. Moreover, the Court dismissed on summary judgment Plaintiff's claims for intentional and negligent infliction of emotional distress, as well as his state civil rights claims. (DE# 197). At trial, the Court granted Defendant's Motion for Judgment as a Matter of Law on Plaintiff's claims of negligent training, retention, and supervision. (DE# 288). Even though Plaintiff's claims were "interrelated, nonfrivolous, and raised in good faith," we may reduce the lodestar to account for his limited success. *Id.*

For guidance in reducing the lodestar, we turn to *Bohen v. City of E. Chicago,* 666 F.Supp. 154 (N.D.Ind.1987), a case involving similar facts: plaintiff prevailed on her sexual harassment claim, but failed on her discriminatory discharge claim. *Bohen,* 666 F.Supp. at 155. Judge Easter-brook, sitting by designation, reduced the plaintiff's fees to account for her limited success, but did so only by 10% across-the-board. *Id.* at 156. He noted that the same witnesses dealt with both aspects of the case and that since the claimed harassment was extensive, it would have been necessary to examine the plaintiff's whole period of employment even without the discharge claim. *Id.* Noting that at least some time was spent solely on the discharge claim, though he could not say precisely how much, Judge Easterbrook concluded that the plaintiff's counsel would have spent about 90% of the time it did had there been no discharge claim. *Id.* The same reasoning applies here. However, the Court awards Plaintiff 80% of the lodestar, estimating that 20% of Plaintiff's counsels' time was devoted exclusively to the discharge claim. Specifically, the Court finds that significant time was spent by Plaintiff examining Defendant's alleged early release program, which was only tangentially related to the hostile environment claim.[15]

Final lodestar figure adjusted for results obtained: $306,467.50 \times .8 = \$245,174$

## IV. Costs

■ The Court recognizes that the traditional limits on what costs may be taxed, *see* 28 U.S.C. § 1920, do not apply to requests submitted under § 1988 and that the Eleventh Circuit traditionally takes a liberal approach when reimbursing attorney expenses. *See Dowdell v. City of Apopka,* 698 F.2d 1181, 1192 (11th Cir. 1983); *Mallory v. Harkness,* 923 F.Supp. 1546, 1557 (S.D.Fla.1996). However, Plaintiff still bears the burden of submitting a request for expenses that would enable the Court to determine what expenses were incurred and whether Plaintiff is entitled to them. *See Loranger,* 10 F.3d at 784. Plaintiff's entries for photocopy, telephone, and fax charges are whol-

---

**15.** Having found that Plaintiff achieved only limited success, we decline to award the 2.0 enhancement requested by Plaintiff. Such enhancements are reserved for cases of "exceptional success." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933.

ly devoid of explanation. The Court has no way of knowing whether the rates paid for the photocopies were reasonable or even whether these expenses were related to this action. Therefore, the Court will not tax these costs or others that lack description. Moreover, the Court finds that the costs incurred prior to commencement of the action are not taxable. *See Dowdell,* 698 F.2d at 1192 ("We hold that, with the exception of routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, *during the course of litigation, or as an aspect of settlement* of the case may be taxed as costs under section 1988.") (emphasis added).

Having deleted expenses associated with the above-described entries, we tax **$67,-150.63** as costs.[16]

## V. Conclusion

As I considered this issue, I reflected upon a letter recently received from a trial lawyer following a discussion on civility and professionalism with the Miami Chapter of the American Board of Trial Advocates. This lawyer stated:

> It seems to me that the courts are basically facing this issue as one of education. Hence we have seminars, guidelines and articles from both that state and federal bench explaining what lawyers should do to be civil and professional to each other. However, I do not think that problem is that lawyers do not know how to act in a civil manner. Rather, I think some lawyers will simply do that with which they can get away.

Special masters, grievance committees and educational seminars are not as effective as a sanction for uncivil behavior.

I know our federal court is quite busy and that the time it takes to consider uncivil behavior may have to be taken from some other pending case. However, I would submit that eliminating uncivil behavior not only helps that case, but every other case in which that lawyer is involved. Moreover, as the word spreads as to the price to be paid for unprofessionalism, other lawyers and other cases will be implicated.[17]

I believe that this reduction in attorney fees is an appropriate response to the conduct by Plaintiff's counsel in this case, but I am not convinced it will deter future misconduct. I frankly considered denying fees altogether but while I have reviewed many of the depositions, I did not observe everything that happened during the pretrial phase of the case. The reduction in attorneys' fees based upon misconduct of counsel is therefore approximately $358,-423.20.[18]

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED that Plaintiff's Amended Verified Motion for Attorney's Fees and Costs (DE# 310) is **GRANTED.** Based on the foregoing we award Plaintiff **$312,324.63** in fees and costs.

Furthermore, because of the misconduct of counsel which occurred in this case, a copy of this order shall be sent to the Florida Bar and the Peer Review Committee for the Southern District of Florida for any action deemed appropriate.

---

**16.** We reached this figure by adding $32,-501.25 in "expenses" to $34,649.38 of what Plaintiff has categorized as "advances."

**17.** Letter from R. Layton Mank, dated November 15, 1999.

**18.** We arrived at this figure by adding up the total hours claimed for Ira Kurzban and Marvin Kurzban—2,059.85 for Ira Kurzban and

429.2 hours for Marvin Kurzban—and multiplying that number by .6 to reflect the Court's 40%, across-the-board reduction for excessive hours claimed. That number—1,493.43—was then multiplied by the $300 rate Plaintiff sought for these attorneys, resulting in a lodestar figure of $448,029. Finally, we multiplied $448,029 by .8 to reflect Plaintiff's limited success.

Appendix A

| Date | Lawyer | Hours | Date | Lawyer | Hours |
|------|--------|-------|------|--------|-------|
| 6/03/96 | BT [11] | 3.8 | 7/24/96 | RL [12] | 1.10 |
| 6/04/96 | BT | 3.50 | 7/24/96 | RL | 4.00 |
| 6/17/96 | BT | .20 | 8/19/96 | RL | .75 |
| 6/19/96 | BT | 1.10 | 8/21/96 | RL | 3.00 |
| 6/21/96 | BT | 2.00 | 8/22/96 | RL | 3.75 |
| 6/23/96 | BT | 2.50 | 8/23/96 | RL | 7.00 |
| 6/24/96 | BT | 10.50 | 8/26/96 | RL | 8.75 |
| 6/25/96 | BT | 5.00 | 8/27/96 | RL | 6.50 |
| 6/27/96 | BT | 3.50 | 8/29/96 | RL | .50 |
| 6/28/96 | BT | 7.50 | 8/30/96 | RL | 3.75 |
| 6/29/96 | BT | 4.70 | 9/09/96 | RL | 1.25 |
| 6/30/96 | BT | 4.00 | | | |
| 7/01/96 | BT | 6.80 | | | |
| 7/02/96 | BT | 9.00 | | | |
| 7/03/96 | BT | 11.00 | | | |
| 7/04/96 | BT | 7.90 | | | |
| 7/05/96 | BT | 8.80 | | | |
| 7/06/96 | BT | 5.00 | | | |
| **Totals** | **BT** | **96.8** | | **RL** | **40.35** |

[11] "BT" refers to Brian Torres, an associate at Kurzban, Kurzban, et al. Defendant notes that during 1995 and 1996, Mr. Torres worked on a class action lawsuit against American Eagle that was dismissed by Judge King on July 29, 1996. Dft's Resp. at 5.

[12] "RL" refers to associate Raquel Libman.