[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 13, 2002
THOMAS K. KAHN
CLERK

No. 00-15111

D. C. Docket No. 98-00107 CV-HL-7

CLARENCE THOMAS,

Plaintiff,

ETHEL L. MUNSON,

Respondent-Appellant,

versus

TENNECO PACKAGING CO., INC.,

Defendant.

Appeal from the United States District Court
for the Middle District of Georgia

**(June 13, 2002)**

Before BIRCH and DUBINA, Circuit Judges, and KATZ[*], District Judge.

PER CURIAM:

Respondent-Appellant Ethel L. Munson, attorney for Plaintiff Clarence Thomas, challenges the district court's decision to sanction her for submitting documents that contained remarks, deemed abusive and offensive by the court, that were directed at counsel for Defendant Tenneco Packaging Company ("Tenneco"). In response to the remarks, the district court, invoking its inherent powers, formally censured and reprimanded Munson. The court also stated that any future documents found, after notice and an opportunity to be heard, to contain such remarks would be stricken without an opportunity to amend or withdraw. We conclude that an attorney who submits documents to the district court that contain *ad hominem* attacks directed at opposing counsel is subject to sanction under the court's inherent power to oversee attorneys practicing before it. We also reject Munson's contention that the district judge in this case should have recused himself. Accordingly, we AFFIRM.

## I. BACKGROUND

The district court levied sanctions against Munson during the course of a

---

[*]Honorable Marvin Katz, U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

race discrimination action marked by acrimony. The action commenced in December 1998 when Thomas, through his attorney Munson, filed suit against Tenneco in the United States District Court for the Middle District of Georgia. Thomas, an African American, had been an employee of Tenneco and its predecessor company since 1978. In his complaint, Thomas alleged that Tenneco denied him promotions to a supervisory position in 1987, 1991, and 1998 because of his race.[1] As a result of the denied promotions, Thomas asserted that he had suffered racial discrimination in violation of 42 U.S.C. § 1981. In response, Tenneco submitted an answer in which the company denied Thomas's allegations of race discrimination and asserted several affirmative defenses, including that the claims raised by Thomas were barred by the applicable statute of limitations.

A. The Discovery Phase

During the ensuing discovery period, several bitter disputes arose between Munson and counsel for Tenneco ("opposing counsel"). One point of contention concerned whether opposing counsel was conducting himself appropriately in deposing Thomas and the plaintiff witnesses. For instance, Thomas originally was deposed on 15 April 1999, but Munson cut short the deposition and postponed any future questioning based on her assertion that opposing counsel was abusive

---

[1]Thomas subsequently was promoted to a permanent supervisory position in 1999.

towards her client.[2]  At the continuation of the deposition on 4 May 1999, Munson again raised the issue of opposing counsel's conduct, and she objected several times to what she considered the insulting and argumentative tone of his questioning.  Yet, at no time during the dispute over how opposing counsel deposed Thomas, and at no time during the disputes over opposing counsel's questioning of other deponents, did Munson seek a protective order under Federal Rule of Civil Procedure 26(c).[3]

---

[2]The deposition transcript reads:
> MS.  MUNSON:  Well, [Thomas is] certainly unable to continue the deposition.  And the reason why . . . is because the abusiveness of counsel led to aggravation of a respiratory disorder that the plaintiff had.

Thomas Dep. at 95 (R2-71).

[3]Rule 26(c) provides as follows:
> (c) Protective Orders.  Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>   (1) that the disclosure or discovery not be had;
>   (2) that the disclosure or discovery may be had only on specified terms and conditions, including a designation of the time or place;
>   (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;
>   (4) that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters;
>   (5) that discovery be conducted with no one present except persons designated by the court;

Munson and opposing counsel also were embroiled in a discovery dispute over the production of certain Tenneco personnel records and the scheduling of several depositions. Specifically, the two attorneys argued over the production of personnel records of several non-party Tenneco employees who were promoted to supervisory positions in lieu of Thomas. Opposing counsel for Tenneco refused to hand over the records until a confidentiality protective order was in effect. In addition, Munson and opposing counsel fought over the deposition schedule for six witnesses, all of whom were either current or past Tenneco employees. In response to motions filed as a result of these disputes, the district court, among other things, granted Tenneco's motion for a confidentiality protective order concerning the personnel records and instituted a schedule for conducting the depositions of the six witnesses.

---

(6) that a deposition, after being sealed, be opened only by order of the court;
(7) that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way; and
(8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.
If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

Fed. R. Civ. P. 26(c).

Munson challenged the district court order by filing a petition for a writ of mandamus with our court. In the petition, Munson referred to opposing counsel's law firm as "[t]he white[] law firm," R2-59-3, and she described the entire discovery dispute over the production of documents and scheduling of witnesses in racial terms. Concerning the deposition schedule instituted by the district court, Munson alleged that "[t]he white[] law firm representing the defendant-employer . . . was permitted to set defendant's deposition schedules without any interference from the court or plaintiff's African-American counsel (a civil rights attorney)." Id. That is, Munson maintained that "unusual deposition schedules [were] forced upon the African-American plaintiff while the white law firm set its own schedule and [proceeded] at its own pace." Id. at 6-7.

In addition, Munson inserted into the mandamus petition derogatory remarks about the Middle District of Georgia in general, and about the district judge hearing the case in particular, in order to suggest that racial bias permeated the discovery order. For example, in one footnote, Munson stated that "civil rights attorneys outside of this jurisdiction have knowledge of the reputation of the Middle District and are not desirous of appearing in that forum." Id. at 2 n.1. Later she remarked: "Although a motion for recusal was considered, such did not appear to be a viable alternative given plaintiff's counsel's prior experiences in the

6

Middle District of Georgia." Id. at 5 n.2. Munson further contended in the petition that the tone of the district judge towards her was "extremely and unusually hostile" and "combative" during one telephone conference. Id. She speculated that "[s]uch seeming[] resentment could be the result of the court having to rule for the plaintiff [on a separate issue] when it did not want to do so," again insinuating that the district judge was biased against her and her client. Id. Concluding that all of these allegations were without merit, we denied the petition for writ of mandamus. See In re Thomas, No. 99-11656 (June 15, 1999).

B.  The District Court's Grant of Summary Judgment to Tenneco

After the acerbic discovery period ended, Tenneco moved for the district court to grant summary judgment in its favor. In moving for summary judgment, Tenneco argued that, with respect to the denied promotions in 1987 and 1991, Thomas's claims for back pay and damages were foreclosed by the statute of limitations. Tenneco also asserted that Thomas did not have evidence sufficient to demonstrate that he was qualified for the supervisor positions that he had sought. Finally, Tenneco alleged that Thomas could not prove that Tenneco acted with discriminatory intent in granting the promotions to other employees.

In response to the motion, Munson filed the Plaintiff's Response to Defendant's Motion for Summary Judgment and the Plaintiff's Statement of

7

Material Facts, the latter of which included several attached exhibits.  As exhibits,

Munson submitted several affidavits, including the affidavits of Thomas and of

Helen Blair.[4]  Both of the affidavits contained *ad hominem* attacks directed at

opposing counsel.  With respect to the Thomas affidavit filed by Munson,

paragraph 12 failed to discuss the underlying promotions claims at issue in the

case.  The paragraph instead contained Thomas's demeaning description of

opposing counsel during the two times that he deposed Thomas.  For instance, in

reference to opposing counsel, Thomas stated that he "was uncomfortable being

around that type of a white person" during his deposition.  Thomas Aff. at 5 (R3-

96 Exh. A).  Thomas also remarked therein that opposing counsel "spit out" and

"snarled" his words at the deposition, and that opposing counsel was "a little man

sp[]ewing venom."  Id. at 6.  Furthermore, Thomas alleged that persons attending

the deposition "were laughing" at opposing counsel, given that his "hair was

standing up on his head, he was biting on a pencil and he was turning red."  Id.[5]

---

[4]Blair was not a party to the Thomas lawsuit.  Rather, she was one of the female plaintiffs in a separate race discrimination lawsuit, Ward v. Tenneco Packaging Co., No. 7:98cv00041 (filed June 22, 1998), that was being litigated before the same district judge.  Blair also was represented by Munson.

[5]Paragraph 12 states in full:
> During my deposition (two of them) I was not able to concentrate. [Opposing] counsel seemed to dislike African Americans, and I was uncomfortable being around that type of a white person (the all white [Tenneco] management . . . have not exhibited to me such an outward show of racial contempt).

8

The Blair affidavit filed by Munson contained similar vitriol directed at opposing counsel. In paragraph 5 of the affidavit, Blair described a conversation she had with Munson after a meeting between a Tenneco manager and several African-American employees who had commenced suit against Tenneco. During the meeting, the manager and the employees allegedly discussed the issue of retaliation. Blair stated in her affidavit that:

> Ms. Munson . . . told me that she would notify the attorney for the company to advise him that he would do well to tell his clients to back off, and that there should be no more of these meetings. I told Ms. Munson the

---

[Opposing counsel] disrespected my wife, who was only turning a page on a document for me to see, and he "yelled" and made sarcastic, inappropriate remarks to me throughout the deposition. He would spit out the word "black" like he could not stand to say the word. The only African American in the room that he did not try to intimidate was Ms. Munson, and he acted like he was afraid of her.

I did catch him giving her "dirty," mean, snide looks. When I told Ms. Munson that [opposing counsel] hated her, Ms. Munson . . . nearly fell out of [her] chair[] in the restaurant laughing. I did not know what that was about, but Ms. Munson told me to just go back into the deposition and tell the counsel not to raise his voice at me; that I was "black" but I was a man like he is.

As Ms. Munson said[, opposing counsel] had no authority over anybody. In the afternoon session, after I asserted myself, he seemed to calm down some. However, his demeanor, evidenced by a little man sp[]ewing venom, was very much over shadowing [sic] the deposition. Towards the end, his client, . . . Ms. Munson, my wife, the court reporter and myself were laughing. [Opposing counsel] appeared to be upset; inasmuch as his hair was standing up on his head, he was biting on a pencil and he was turning red. Also, his voice was raised as he snarled out words.

Thomas Aff. at 5-6 (R3-96 Exh. A).

little attorney seemed to be part of the problem, and he probably put them up to this.

Ms. Munson said maybe so since he is trying to win at all cost, and he apparently has grossly under estimated [sic] us . . . .

Blair Aff. at 3 (R3-96 Exh. E). Thus, as with the Thomas affidavit, the Blair affidavit served in part as a vehicle for showering opposing counsel with invective.

Other documents submitted in response to Tenneco's summary judgment motion also contained *ad hominem* attacks directed at opposing counsel. One such document filed by Munson was the Plaintiff's Amended Supplement to Plaintiff's Response to Defendant's Motion for Summary Judgment (the "Plaintiff's Amended Supplement"). In the Plaintiff's Amended Supplement, Munson responded to opposing counsel's argument that many of the plaintiff's affidavits were for witnesses who had not been properly identified in mandatory interrogatories. She responded by asserting that opposing counsel was making this argument because he "ha[d] failed to do his job." R4-104-1. Munson, moreover, referred to an accusation made by opposing counsel that her personal attacks upon him were inappropriate[6] as an example of "psycho babbling," id. at 3, and she

---

[6]Opposing counsel made this accusation in the Defendant's Reply Brief in Support of Its Motion for Summary Judgment (the "Defendant's Reply Brief"). He alleged therein that "[t]he disingenuous practice of Plaintiff and his counsel of mischaracterizing [] every act and decision as racist is further apparent from their inappropriate, unprofessional, and groundless attacks on this Court and defense counsel, which have been pervasive throughout this and other litigation." R3-100-1-2.

10

remarked that opposing counsel was "just 'grip[]ing' because the plaintiff has out

smarted [sic] him by not giving him a 'road map' of his evidence," id. at 4 (second

alteration in original). She also maintained that opposing counsel did not have "the

right to judge African Americans" because "African Americans often process

information differently than white individuals[, and] [t]he distinction between rude

and racist conduct is often made by a split judgment that is not developed by

whites." Id. at 3-4 n.4. She further contended:

> [D]efendant's counsel is basically urging this court to
> align itself with him, and repudiate African Americans'
> constitutional rights to call perceived racism like they see
> it. Accordingly, plaintiff respectfully requests that
> should this court have the need to serve as a witness for
> the white defendant employer . . . it rec[use] itself."

Id. at 3-4 (internal footnotes and parenthesis omitted).[7] Finally,

---

[7]We reproduce here the full paragraph in the Plaintiff's Amended Supplement in which
Munson addresses opposing counsel's claim that the comments made about him in documents
filed by her were inappropriate:

> [Opposing] counsel's characterization of plaintiff and/or
> his counsel's statements
> Such petty innuendos and "gripes" are not worthy of a
> response. This is the United States of America, and the last [time
> the] plaintiff read the constitution the First Amendment applied to
> him and his African-American counsel. Simply because they do
> not agree with [opposing] counsel's conduct or his racially
> offensive manner in which he conducted himself during these
> depositions, does not mean that they have engaged in the
> disingenuous practice of "mischaracterizing [] every act and
> decision as racist" (who is to decide that this is disingenuous...
> defendant's white counsel?). Aside from his psycho babbling,
> plaintiff's only concern is the uncompromising position that he has
> placed the court ([opposing] counsel is basically urging this court

11

to align itself with him, and repudiate African Americans'
constitutional rights to call perceived racism like they see it).
Accordingly, plaintiff respectfully requests that should this court
have the need to serve as a witness for the white defendant
employer that it rec[use] itself.

R4-104-2-4 (internal footnotes and citations omitted).

Munson further explained her response to opposing counsel's claim in three footnotes inserted into the above-referenced paragraph. In the first such footnote, Munson explained the behavior of opposing counsel that she believed justified the pejorative remarks about him that were contained in documents that she had filed:

[Opposing] counsel even though he may not have been
culturally aware of his behavior was talking down to the African
American witnesses in a very condescending manner. [Opposing
counsel] even asked plaintiff if he had to bring his wife to the
deposition or if [plaintiff] needed to go eat lunch. In the second
deposition, plaintiff's counsel had to remind [opposing] counsel
over and over that plaintiff was a grown man and it was
inappropriate to lecture him like he was a "boy." One of the other
witnesses was on the verge of "slapping [opposing counsel]"
during these depositions. During a recess, plaintiff's counsel had
to call the witness's wife to convince the witness not to go into the
deposition and engage in violence against [opposing counsel]. The
witness was upset at the tone, the racism and the sarcasm that
[opposing] counsel had be using [] with all the African American
plaintiffs and their counsel (plaintiff's counsel agreed with the
witness assessment of the conduct but not the self-help remedy).
She encouraged the witness to contact the bar or the court and file
the necessary complaints because [the] conduct [of opposing
counsel] was out of control.

Id. at 2-3 n.2 (internal record citations omitted). In the next footnote, Munson elaborated on her own statements directed at opposing counsel and at the district judge that were contained in the mandamus petition and elsewhere:

Any statements that plaintiff's counsel made in Thomas's
Petition for Writ of Mandamus have been read and considered by a
panel of Eleventh Circuit jurist[s]. Additionally, plaintiff's
counsel argues quite frequently in the Eleventh Circuit and quite
frankly, she presents her oral arguments just like she presents such
in written briefs (last case in which she argued a conservative
panel reversed probably one of the most liberal trial judges in the
Northern District in a race case). There was no disciplinary action
against the plaintiff's counsel [by the Eleventh Circuit], and they
are certainly the tribunal that could administer such (is [opposing]

12

Munson, in explaining why opposing counsel's conduct warranted the remarks

made about him, insinuated that he risked physical attack:

> One of the other witnesses was on the verge of "slapping [opposing counsel]" during these depositions. During a recess, plaintiff's counsel had to call the witness's wife to convince the witness not to go into the deposition and engage in violence against [opposing counsel]. The witness was upset at the tone, the racism and the sarcasm that [opposing] counsel had be using [] with all the African American plaintiffs and their counsel (plaintiff's counsel agreed with the witness assessment of the conduct but not the self-help remedy).

Id. at 2-3 n.2 (internal record citation omitted).

Another document filed by Munson that contained *ad hominem* attacks was

the Declaration of Beatrice Mercer,[8] which was attached as an exhibit to the

---

> counsel contending that the constitution does not apply to plaintiff's counsel, a "black[,]" because her truthful statements are offensive to some whites?). Did any court make that finding? . . .

Id. at 3 n.3. In the final footnote, Munson asserted that the personal attacks upon opposing counsel were not improper because there are differences between African Americans and whites:

> African Americans often process information differently than white individuals. The distinction between rude and racist conduct is often made by a split judgment that is not developed by whites. Because of their privileged status, whites do not need to think about race, however, this does not give white counsel such as [opposing] counsel the right to judge African Americans. As one well renown[ed], African American sociologist responded to white America's fixation [with the notion] that there is no racism in this country: "[Y]ou can't chase butterflies unless you know what a butterfly is."

Id. at 3-4 n.4.

[8]Like Helen Blair, Mercer was a female plaintiff in the race discrimination lawsuit of Ward v. Tenneco Packaging Co., not the Thomas lawsuit.

13

Plaintiff's Amended Supplement. In the declaration, Mercer disclosed a conversation she had with Munson and Matthew Williams[9] following the morning session of Williams's deposition that had been conducted by opposing counsel. Mercer stated generally that, during their conversation, Williams had told her about opposing counsel's "racist conduct," Mercer Decl. at 2 (R4-104 Exh. A), and she asserted that Williams had told her that opposing counsel's "behavior and mannerism[s] indicated that he hated 'blacks,'" id. at 3. Furthermore, Mercer related that Williams commented to her that opposing counsel looked "pretty silly" and that he was willing to "'kick his ass'" if opposing counsel "did anything" to Munson. Id. Mercer's declaration, in fact, contained a racist comment: Mercer remarked therein that, during her conversation with Munson and Williams, Munson told her opposing counsel "had no authority over her and [that] she was unimpressed with him or his race." Id.

In addition to these statements, Mercer described her impressions of opposing counsel when he deposed Blair and David Ward in the Ward case. She opined:

> It was like [opposing counsel] could not stand to look at
> us, or how dare you group of low-based "blacks"

---

[9]Williams was a plaintiff represented by Munson in a third race discrimination case brought against Tenneco, Williams v. Tenneco Packaging Co., No. 7:98cv00091 (filed Nov. 2, 1998).

challenge good white people. His facial expressions and body language reminded me of a picture of the Grand Wizard of the KKK (the witnesses gave [opposing counsel] that knick name [sic]). He would spit out his words to us like we were "trash."

Id. at 4. She also described her impressions of opposing counsel at her own deposition, remarking that "[h]e was snarling his words, raising his voice, squinting his eyes and apparently trying to intimidate me." Id. at 3. Indeed, she went so far as to comment that she contemplated "going home and getting [her] son to confront" opposing counsel because he had "disrespected . . . and talked down to" her. Id. In sum, as these examples illustrate, Mercer's declaration, filed by Munson, was overflowing with inflammatory statements directed at opposing counsel.[10]

---

[10]The full text of the relevant portions of Mercer's declaration reads as follows:

    5.    Another time during Matthew Williams' depositions, I was having lunch with Mr. Williams and Ms. Munson over at Old South [B]ar-b-que in Valdosta. Mr. Williams was very upset about the morning session of his depositions. Mr. Williams gave some examples which I do not recall at this time, about [opposing counsel]'s racist conduct. I do recall Mr. Williams saying that [opposing counsel]'s behavior and mannerism[s] indicated that he hated "blacks". Matter of fact[,] Ms. Munson and myself agreed with Mr. Williams who seemed upset because Ms. Munson did not respond to [opposing counsel] during the deposition. Mr. Williams said that he interpreted this as [opposing counsel] intimidating Ms. Munson by attempting to direct her. He asked Ms. Munson what was that about. Ms. Munson told him that [opposing counsel] had no authority over her and she was unimpressed with him or his race.

    6.    Mr. Williams then started laughing and told me about the

After Munson filed these documents, opposing counsel filed the Defendant's

way[] Ms. Munson ignored [opposing counsel] throughout the deposition (she would not even answer him). Mr. Williams opined that [opposing counsel] looked pretty silly talking to himself, and everyone in the room looked puzzled except Ms. Munson. Mr. Williams told Ms. Munson not to worry because if [opposing counsel] did anything to her, he would "kick his ass." Ms. Munson seemed surprised and told Mr. Williams not to waste that type of emotional energ[y] on [opposing counsel].

7. During my own deposition, I thought about going home and getting my son to confront [opposing counsel] because he disrespected me, and talked down to me. He was snarling his words, raising his voice, squinting his eyes and apparently trying to intimidate me. He even asked me why I used the word "white" in describing my previous employers. I told him he was asking me for the races of people and since I did clean white peoples' houses, I had no reason not to give their race. He seemed to be upset with my answer.

8. For my case, I was present for the depositions of Helen Blair and David Ward. [Opposing counsel] spoke in this demeaning way to them also. It was like he could not stand to look at us, or how dare you group of low-based "blacks" challenge good white people. His facial expressions and body language reminded me of a picture of the Grand Wizard of the KKK (the witnesses gave [opposing counsel] that knick name [sic]). He would spit out his words to us like we were "trash".

9. During the depositions on my case, I confronted him and asked him why he was looking at us (African Americans) like we were dirt. I asked him what was his problem, and why he could not be civil enough to say good morning. He sort of backed up, and tried to move away from me (like I was going to strike him or something). Since that conversation, he has at least been civil and would speak to me.

Mercer Decl. at 2-4.

16

Motion to Exclude Affidavit Testimony Submitted by Plaintiff (the "Defendant's Motion to Exclude"). In the motion, opposing counsel argued, among other things, that paragraph 12 of the Thomas affidavit and the entire Blair affidavit should be stricken from the record. The Mercer declaration, he maintained, also should be stricken in its entirety because its contents were nothing more than "an irrelevant, self-serving, unsupported, and inappropriate personal attack on defense counsel for which Ms. Mercer and her attorney should be sanctioned." R4-105-14. Opposing counsel called for sanctions against Munson at another point in the motion as well, asserting that sanctions were appropriate based on the pattern of "continuing abusive tactics" employed by her. Id. at 5.

Munson then filed the Plaintiff's Response to Defendant's Motion to Exclude Affidavit Testimony Submitted by Plaintiff (the "Plaintiff's Response to Defendant's Motion to Exclude"). With reference to the alleged abusive tactics employed by her and her client, she retorted that "[n]either plaintiff nor his counsel has the slightest idea as to what [opposing] counsel is referring (plaintiff's description of the white defense counsel's repugnant racial conduct is supported by the other plaintiffs and/or their witnesses)." R4-107-4 (internal footnote omitted). Furthermore, in response to opposing counsel's contention that the allegations of racist conduct on his part were unsupported, Munson commented in footnote 2:

17

[Opposing] counsel's bald denial even if genuine does not mean that his conduct was not racially offensive. Plaintiff believes the same as one of [the] Sixth Circuit's most learned jurist[s], . . . who declared in an interview[,] "A lot of white people don't understand that what they are doing is racist." Who is plaintiff to believe on the issue of racism, a learned, Sixth Circuit, African-American appellate jurist or a white defense counsel trying to win a case? Plaintiff's counsel certainly would make her copy of the foregoing available to [opposing] counsel. It appears as if he is uninformed as to the pervasiveness of the race problem not only in the judicial system but also in America.

Id. at n.2 (internal citation omitted).

Subsequent to Munson's filing of the response, the district court granted summary judgment to Tenneco. The court also denied the Defendant's Motion to Exclude, stating that the objections to the affidavits would be considered as objections to testimony as part of the court's summary judgment analysis.[11] The district court concluded that Thomas's claims for any relief other than equitable relief for the denied promotions in 1987 and 1991 were barred by the applicable statute of limitations period. As to Thomas's ability to obtain equitable relief for the 1987 and 1991 claims, the court held that Thomas could not obtain declaratory relief because he was seeking to have past conduct declared discriminatory. Thomas could not obtain injunctive relief, the district court further held, because he

---

[11]The court did not address opposing counsel's request for sanctions.

18

already had obtained the relief sought in 1999, namely, a permanent supervisory position at Tenneco. Furthermore, with regard to Thomas's claim based on his denied 1998 promotion, the court ruled that Thomas had not made out a prima facie case of discrimination under the McDonnell Douglas/Burdine[12] burden-shifting formula because he had failed to show that he was qualified at that time for a Tenneco supervisory position. For these reasons, the district court granted Tenneco's motion for summary judgment and entered judgment in favor of Tenneco and against Thomas. Thomas then challenged the district court's summary judgment decision in an appeal separate from the instant one. After holding oral argument, we affirmed pursuant to Eleventh Circuit Rule 36-1. Thomas v. Tenneco Packaging Co., 268 F.3d 1066 (11th Cir. 2001) (unpublished table decision), cert. denied, __ S. Ct. __ (2002).[13]

---

[12]Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).

[13]Following our affirmance of the summary judgment order, Munson submitted to our court a letter dated 27 July 2001 that she had sent to Bob Hurbert, a columnist at the New York Times. In the letter, Munson gave her description of the oral argument before our court:
> On July 18, 2001, I argued the case of *Clarence Thomas v. Tenneco Packaging, Inc.,* No.00-14691 (11th Cir. Appeal) before a panel of three judges . . . . I brought a mixed group of supporters: civil rights activists, sociologists, political science professors, pharmacists, and a civil rights attorney . . . .
>      . . . The group [of supporters] was . . . shocked at what they deemed the poor performance of the white defense counsel (he shuttered; failed to respond to the judges' questions; could not hold a steady eye-gaze with any of the panel members; and basically cited no legal authorities in support of his opinions.) I quickly

19

C.  The Imposition of Sanctions against Munson

Following entry of judgment in favor of Tenneco, the district court issued an order directing Munson to show cause why sanctions should not be levied against her.[14]  The court stated that it was issuing the Show Cause Order because "various documents submitted by Plaintiff's counsel . . . contain improper, offensive, and insulting statements which amount to little more than personal attacks on opposing counsel."  R4-113-1.  Specifically, the district court pointed to five documents that contained "personal attacks on [opposing counsel's] character

responded to the group's assessment of the attorney with a simple explanation — he does not need to be any better — he is white; he is representing a white corporation; and he is arguing before three white judges.

Open Letter from Ethel L. Munson, Esq., to Bob Hurbert, Columnist, New York Times 1 (July 27, 2001) (received by Clerk of Court, July 31, 2001).  She also stated in the letter: "My clients are black and they are poor — but they are still citizens of the United States.  They do not deserve to have a handful of white judges trample upon their Constitutional rights." Id. at 2 (emphasis omitted).  Referring to the fact that, in her view, the Eleventh Circuit discriminates against African American plaintiffs in race discrimination cases, Munson remarked that "[w]e are not stupid; we just have the misfortune of being born with a different skin color in hostile white America." Id.  She commented, furthermore, that "[t]his is 37 years after integration, and we still face a judicial system in the Eleventh Circuit that reminds us that we are black, something more than a lower class animal but never a person like a white individual." Id. (emphasis omitted).  Munson then brought the letter to a close by stating: "We not only want, but we deserve justice — courts void of racial bias.  Racism is not only a cowardly act but it is ignorance." Id. at 3.

[14]Munson reiterates throughout her appellate brief that the district court's Show Cause Order and the order levying sanctions against her were issued *sua sponte*. In the Defendant's Reply Brief and in the Defendant's Motion to Exclude, however, opposing counsel had requested sanctions against Munson and had called attention to the personal attacks directed at him.  Thus,  even though the district court in its Show Cause Order did not specifically make reference to opposing counsel's prior request for sanctions, Munson's characterization of the Show Cause Order as being issued *sua sponte* is not accurate.

20

and his fitness as an attorney." Id.  The court referenced the following:  (1) paragraph 12 of the Thomas affidavit; (2) paragraph 5 of the Blair affidavit; (3) the Plaintiff's Amended Supplement; (4) the Mercer declaration; and (5) footnote 2 of the Plaintiff's Response to Defendant's Motion to Exclude.  Based on the offensive remarks about opposing counsel contained in the five documents, the court stated that it was considering the imposition of sanctions on Munson.  Before it reached a conclusion on the matter, however, the district court noted that Munson was to have an opportunity to respond.  Accordingly, the court granted Munson twenty days to show cause why sanctions would not be proper.

In response to the Show Cause Order, Munson filed two documents, Plaintiff's Counsel's Response to the Court's Show Cause Order (the "Response"), and Plaintiff's Counsel's Supplement to Her Response to the Court's Show Cause Order (the "Supplement").  In the Response, Munson began by focusing on the race of the district judge and by expressing her inability to understand how the remarks made against opposing counsel could be considered offensive:

> While there is no doubt that there are cultural differences between the court, a white male, plaintiff's counsel and [opposing] counsel, nevertheless, plaintiff's counsel shall address each and every item raised in the court's show cause order although she is not sure how these "so-called" attacks relate to [opposing counsel]'s character or his fitness as an attorney.

21

R4-117-1. After alleging that the various remarks against opposing counsel were justified due to his behavior towards her clients, Munson stated: "Therefore, plaintiff's counsel can only view this court's show cause order as harassment of a civil rights attorney. There does not appear to be any other legitimate basis to such an order at this stage of the litigation (the notice of appeal has already been filed)." Id. at 4. Munson further commented:

> Plaintiff's counsel believes that the court treated us differently because of our race, and the nature of the plaintiffs' cases, Title VII or § 1981. Consequently, in response to our complaints, the civil rights groups are in the process of drawing up plans to protest the treatment that the African-American plaintiffs received before this court and other courts in the Middle District of Georgia in a demonstration before the U.S. Court of Appeals for the Eleventh Circuit (now scheduled for October 6, 2000).

Id. at n.1. Similarly, in the Supplement, she "urge[d] [the] court to go forward with its 'consideration for sanctions,'" explaining that she "would welcome the opportunity to have this subject fully adjudicated, inasmuch as, she, the same as most African-American counsel and their clients, [was] often the victims of these types of actions." R4-118-3.

After the twenty days for responding to the Show Cause Order had elapsed, the district court issued an order levying sanctions against Munson. In its order, the court first stated "that the responses of Ms. Munson [to the Show Cause Order]

22

are purposefully misleading, dissembling, irrelevant, disrespectfully truculent, and unresponsive to the inquiry and concerns of the Court." R4-119-1. The district court then noted that, based on the record before it, there was "no justification, other than an apparent and (within the context of the proceedings in this case) inexplicable hypersensitivity to racial differences, for the conduct of Ms. Munson." Id. The court went on to find that the record supported the imposition of sanctions for Munson's conduct towards opposing counsel:

> Ms. Munson evidently views every obstacle encountered in this case as the product of racism. The charge of racism is both serious and demeaning. To level this charge against another based solely on subjective assumptions and the routine frustrations encountered by all litigators is more than bad manners; it is just plain wrong. An unfounded accusation of racism is the modern equivalent of "fighting words" intended to defame and hold up to public ridicule. Such conduct cannot be tolerated by this Court, which is prepared to deal speedily and firmly with any racist conduct relevant to any matter before it. And, just as the Court will not permit actual racism to invade its proceedings, so will it surely protect itself, its officers and its litigants from unwarranted and malicious accusations of the same.
> The Court finds that the portions of the pleadings referenced in the Show Cause Order are irrelevant to any issue in this case. The Court further finds that the conduct of Ms. Munson in filing these pleadings was unprofessional, inconsistent with the standards of conduct expected by the Court of the members of its bar, and intentional, and done for the purpose of deliberately provoking unnecessary personal animosity and conflict between opposing counsel and for the purpose of creating

23

> an unjustified and false impression that the opposing
> legal positions of the parties were the result of racism on
> the part of defense counsel.

Id. at 1-2 (internal footnote omitted).  As a result of these findings, the district

court invoked its inherent power to oversee attorneys practicing before it.  The

court formally rebuked and censured Munson for her conduct, and the court stated

that any future documents filed by Munson that were found, after notice and an

opportunity to be heard, to contain such remarks would be stricken without an

opportunity to amend or withdraw.[15]

D.  Munson's Response to the Imposition of Sanctions

Subsequent to the district court's imposition of sanctions, Munson filed the

present appeal challenging the sanctions order.  Thereafter, she filed in district

court the Plaintiff's Motion to Recuse Trial Judge (the "Plaintiff's Motion to

Recuse") and the Plaintiff's Amended Motion to Disqualify Trial Judge (the

"Plaintiff's Amended Motion").  In the Plaintiff's Motion to Recuse, Munson

argued that "inappropriate remarks about racism" were contained in the order

levying sanctions, and that, as a result, the district judge should recuse himself both

---

[15]The district court noted that it chose only to deal with the conduct of Munson towards opposing counsel and that the sanctions imposed were for such conduct.  The court pointed out that it had decided not to address or sanction Munson's irrelevant and abusive comments made throughout the litigation about the Middle District, the district court, and the Eleventh Circuit.

from further proceedings in the case[16] and from other race discrimination cases involving Munson. Supp. R1-122-1 (internal footnote omitted). She remarked that the district judge "ha[d] taken on the stance of a protectorate for white America." Id. at 2. Elaborating, Munson commented: "Plaintiff also argues that [the judge] has no cultural awareness or understanding of the cultural diversity of the litigants and, presumably, some counsel appearing before him." Id. at 3. Munson reiterated these same accusations in the Plaintiff's Amended Motion, but she also included a comment insinuating that the entire Middle District of Georgia was biased against African Americans who bring race discrimination cases: "This plaintiff . . . had a difficult time obtaining counsel who would take a civil rights' race case in the Middle District." Supp. R1-123-4 n.4 (emphasis omitted). The district judge denied Munson's motions and declined to recuse himself.[17] As a consequence, Munson amended her notice of appeal of the sanctions order to include an appeal of the order in which the district judge ruled that he need not recuse himself. In the instant appeal, therefore, Munson challenges both the sanctions order and the order

---

[16]At the time Munson filed her recusal motion, Tenneco's request for attorney's fees still was pending before the district court.

[17]Following the district court's denial of Munson's recusal motion, the court denied the defendant's motion for attorney's fees.

denying her recusal motion.[18]

On appeal, Munson raises several arguments as to why we should vacate the sanctions order. Munson focuses on the remarks directed at opposing counsel that were contained in the Thomas and Blair affidavits and the Mercer declaration. She contends that the remarks are attributable solely to the affiants or the declarant, not to her, and that, consequently, she cannot be held personally responsible for the remarks. Munson asserts, moreover, "that the mere act of filing affidavits [or declarations] that contain opinions of the witnesses that may have been offensive to others cannot meet the high threshold of bad faith," and thus cannot be sanctioned under a court's inherent powers. Munson Appellant Br. at 7. Furthermore, before the district court could find that she acted in bad faith and sanction her, Munson contends that the court had to make an explicit finding that she counseled Thomas, Blair, or Mercer to insert the remarks about opposing counsel, or that she drafted the remarks herself. Her position is that the district court, by failing to make such a factual finding or to hold an evidentiary hearing on the factual issue, abused its discretion in imposing sanctions.

Munson presents other arguments in her appellant brief as well. She argues

---

[18]Munson filed a separate appeal challenging costs in the amount of $2,668.90 that were entered against Thomas. We dismissed the appeal for lack of jurisdiction. Thomas v. Tenneco Packaging Co., No. 01-10728 (11th Cir. Jan. 15, 2002).

26

that, because the remarks at issue were about how opposing counsel conducted himself during the litigation, the remarks were relevant under Federal Rule of Evidence 401 and constituted proper personal opinion evidence under Rule 701. Munson also maintains that the district court's sanction order violates the First Amendment free speech rights of her client, and that the order is so broad that it "'chills the rights' of [her] clients to have effective, unrestrained representation by an attorney of their choosing and of their own ethnic background." Id. at 8.

Additionally, Munson raises the recusal issue in her appellant brief and argues that the district judge erred in denying her recusal motion. As evidence of the district judge's racial bias, she points to the sanctions order itself. She alleges that, by issuing the sanctions order, the district judge "assumed a stance as a protectorate of white American, and engaged in psychoanalysis" by criticizing her for allegedly turning every dispute between counsel in this litigation into a racial dispute. Id. at 4. Munson, furthermore, states that, by sanctioning her but not opposing counsel, "the district court's order favors the protection of one race over the other (some whites believe that there is no racism in America, and that 'blacks' are constant whiners about 'so-called' racism because they only want a government handout)." Id. at 15. As a result of the racial bias purportedly demonstrated by the sanctions order, Munson asserts that the district judge should

27

have recused himself under 28 U.S.C. § 455.

## II. DISCUSSION

A. The Standard of Review

We review a district court's imposition of sanctions for an abuse of discretion. In re Mroz, 65 F.3d 1567, 1571 (11th Cir. 1995).[19] A district judge's decision whether to recuse himself is reviewed under the same standard. Murray v. Scott, 253 F.3d 1308, 1310 (11th Cir. 2001).

B. The Sanctions Issue

As we have noted, the district court relied on its inherent powers to levy sanctions against Munson. "It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 2132 (1991) (internal quotations and brackets omitted). Accordingly, "[c]ourts of justice are universally acknowledged to be vested, by

---

[19]In reviewing whether the district court abused its discretion in imposing sanctions, we focus exclusively on the five documents filed by Munson that are listed in the court's Show Cause Order as potential bases for sanctions, and we focus exclusively on the remarks therein directed at opposing counsel. In Part I of this opinion, we have pointed to derogatory comments aimed at the Middle District of Georgia, the district judge, and our court which are found in other submissions by Munson. We have done so to provide an accurate and thorough recounting of the factual background of this case, but these comments are not the basis for the conclusions we reach in this opinion.

their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." Id. (internal quotations omitted); see also Byrne v. Nezhat, 261 F.3d 1075, 1131-32 n.110 (11th Cir. 2001) (providing overview of the inherent powers lodged in Article III courts). This means, among other things, "that a federal court has the power to control admission to its bar and to discipline attorneys who appear before it." Chambers, 501 U.S. at 43, 111 S. Ct. at 2132; see also Roadway Express, Inc. v. Piper, 447 U.S. 752, 766, 100 S. Ct. 2455, 2464 (1980) (noting that "[t]he power of a court over members of its bar is at least as great as its authority over litigants"). That is, "[e]ven absent explicit legislative enactment, deeply rooted in the common law tradition is the power of any court . . . to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." Carlucci v. Piper Aircraft Corp., 775 F.2d 1440, 1447 (11th Cir. 1985) (internal quotations omitted). This "inherent power" to sanction errant lawyers, in fact, "can be invoked even if procedural rules exist which sanction the same conduct." Chambers, 501 U.S. at 49, 111 S. Ct. at 2135; see also In re Mroz, 65 F.3d at 1575 (pointing out that "although certain conduct may or may not be violative of Rule 11 or Bankruptcy Rule 9011, it does not necessarily mean that a party will escape sanctions under the court's inherent power").

Due to the scope of the inherent powers vested in federal courts, however, it is necessary that such courts "exercise caution in invoking [their] inherent power." Chambers, 501 U.S. at 50, 111 S. Ct. at 2136. Hence, before a court can impose sanctions against a lawyer under its inherent power, it must find that the lawyer's conduct "constituted or was tantamount to bad faith." Durrett v. Jenkins Brickyard, Inc., 678 F.2d 911, 918 (11th Cir. 1982); see also Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power is a finding of bad faith."). "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." Barnes, 158 F.3d at 1214 (internal quotations omitted). Additionally, for the imposition of sanctions to be proper, a court "must comply with the mandates of due process," Chambers, 501 U.S. at 50, 111 S. Ct. at 2136, meaning that the lawyer facing sanctions must be provided with notice and "an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions." In re Mroz, 65 F.3d at 1575-76.

Based on these principles and on our review of the record, we conclude that the district court did not abuse its discretion in sanctioning Munson pursuant to the

court's inherent power. The five documents filed by Munson that the district court referenced — paragraph 12 of the Thomas affidavit, paragraph 5 of the Blair affidavit, the Plaintiff's Amended Supplement, the Mercer declaration, and footnote 2 of the Plaintiff's Response to Defendant's Motion to Exclude — evince bad faith on the part of Munson in her conduct towards opposing counsel. As our extensive citation to the five documents in Part 1 shows, the documents are saturated with invective directed at opposing counsel. For instance, the five documents filed by Munson are pervaded with rude, demeaning remarks about opposing counsel's physical traits and demeanor.[20] Additionally, the documents filed by Munson contain attacks upon the fitness of opposing counsel as a member of the bar,[21] and they contain statements that can only be construed as thinly veiled

---

[20]See, e.g., Thomas Aff. at 6 (stating that during Thomas's deposition, opposing counsel "spit out" and "snarled" his words, that he was "a little man sp[]ewing venom," and that others "were laughing" at him because "his hair was standing up on his head, he was biting on a pencil and he was turning red"); Blair Aff. at 3 (describing opposing counsel as "the little attorney"); Plaintiff's Am. Supp., R4-104-3 (upbraiding opposing counsel for his "psycho babbling"); Mercer Decl. at 3 (asserting that opposing counsel looked "pretty silly" and that at her deposition "[h]e was snarling his words, raising his voice, [and] squinting his eyes" ); id. at 4 (alleging that opposing counsel would "spit out his words" and that "[h]is facial expressions and body language reminded me of a picture of the Grand Wizard of the KKK").

[21]See Blair Aff. at 3 (commenting that Munson told her that opposing counsel "is trying to win at all cost" and remarking that he "probably put [Tenneco] up to" retaliating against certain African-American employees); Plaintiff's Am. Supp., R4-104-1 (stating that opposing counsel "ha[s] failed to do his job"); id. at 4 (maintaining that opposing counsel was "just 'grip[]ing' because the plaintiff has out smarted [sic] him by not giving him a 'road map' of his evidence").

31

physical threats.[22]  Munson, in fact, even went so far as to file a document

containing an overt racial slur made by her.  See Mercer Decl. at 3 (stating that

Munson had remarked that she "was unimpressed with [opposing counsel] or his

race").  Finally, the five documents are strewn with generalizations and conclusory

comments that paint opposing counsel as a racist bigot and thus impugn his

character.[23]

---

[22]See Plaintiff's Am. Supp., R4-104-2-3 n.2 (stating that "[o]ne of the other witnesses was on the verge of 'slapping [opposing counsel]' during these depositions" and that "[d]uring a recess, plaintiff's counsel had to call the witness's wife to convince the witness not to go into the deposition and engage in violence against [opposing counsel]"); Mercer Decl. at 3 (relating that Williams, a plaintiff in a different race discrimination suit against Tenneco, told her that he was willing to "kick his ass" if opposing counsel "did anything" to Munson); id. (commenting that at her deposition she contemplated "going home and getting [her] son to confront" opposing counsel).

[23]See Thomas Aff. at 5 (stating that opposing "counsel seemed to dislike African Americans," and that he "was uncomfortable being around that type of a white person," given that "the all white [Tenneco] management had not exhibited to me such an outward show of racial contempt"); Blair Aff. at 3 (relating that "the little attorney seemed to be part of the problem, and he probably put [Tenneco] up to" retaliating against employees who claimed race discrimination); Plaintiff's Am. Supp., R4-104-2 n.2 (stating that opposing "counsel even though he may not have been culturally aware of his behavior was talking down to the African American witnesses in a very condescending manner" and maintaining that she, Munson, "had to remind [opposing] counsel over and over that plaintiff was a grown man and it was inappropriate to lecture him like he was a 'boy'"); id. at 3-4 (asserting that opposing "counsel is basically urging this court to align itself with him, and repudiate African Americans' constitutional rights to call perceived racism like they see it") (internal footnote omitted); Mercer Decl. at 3 (alleging that she was told that opposing counsel's "behavior and mannerism[s] indicated that he hated 'blacks'"); id. at 4 ("It was like [opposing counsel] could not stand to look at us, or how dare you group of low-based 'blacks' challenge good white people.  His facial expressions and body language reminded me of a picture of the Grand Wizard of the KKK."); Response to Defendant's Motion to Exclude, R4-107-4 n.2 (indicating that opposing counsel's denial of racism should not be believed because he is "a white defense counsel trying to win a case" whose culture blinds him from understanding that his conduct is racist).

32

Due to the insertion of all these patently offensive remarks in the five documents, the district court did not err in finding that Munson filed the documents in bad faith, namely, "for the purpose of deliberately provoking unnecessary personal animosity and conflict between opposing counsel and for the purpose of creating an unjustified and false impression that the opposing legal positions of the parties were the result of racism on the part of [opposing] counsel." R4-119-2. The district court's finding was correct because the remarks serve no purpose other than to harass and intimidate opposing counsel, and thus are inconsistent with basic rules of professional conduct that apply to Munson.[24] The Standards of Conduct

---

[24]By practicing in the Middle District of Georgia, Munson had to conform to the following standards for professional conduct:

> Attorneys practicing before this Court shall be governed by this
> Court's Local Rules, by the Rules of Professional Conduct adopted
> by the highest court of the state in which this Court sits, as
> amended from time to time by that state court, and, to the extent
> not inconsistent with the preceding, the American Bar Association
> Model Rules of Professional Conduct, except as otherwise
> provided by specific Rule of this Court.

Middle Dist. R. 83.2.1(A).

We note that in its order imposing sanctions upon Munson, the district court did not cite to the specific ethics rules that she had violated, even though the court did state that her conduct "was unprofessional [and] inconsistent with the standards of conduct expected by the Court of the members of its bar." R4-119-2. This was sufficient under the circumstances of this case, where the sanctions imposed were relatively mild — a formal censure and reprimand, followed by an order to discontinue such conduct in future submissions to the court — and where the attorney's conduct was patently offensive. The situation would be different if the sanctions levied against Munson for her ethics violations had been more severe, such as in the disqualification context, in which case a district court's analysis must be more exacting. For instance, in discussing the denial of a motion for admission *pro hac vice*, we have stated that "where the district court's disqualification order is based on an allegation [that an attorney committed an] ethical violation, the court . . . must clearly identify a specific Rule of

33

found in the Local Court Rules of the United States District Court for the Middle

District of Georgia provide that an attorney must "communicate respectfully with

other lawyers." Middle Dist. Rules, Standard of Conduct A(2). A lawyer also must

"avoid creating unnecessary animosity or contentiousness." Standard A(7). With

respect to "Written Submissions to a Court, Including Briefs, Memoranda,

Affidavits and Declarations," Standard B(3)(b) specifically states that "[n]either

written submissions nor oral presentations should disparage the intelligence, ethics,

morals, integrity or personal behavior of another lawyer or his/her client, unless

such matters are directly and necessarily in issue." Standard B(3)(b).

Similarly, Munson's filing of documents that contained harassing and

intimidating remarks directed at opposing counsel violates several ethics

provisions adopted by the Supreme Court of Georgia.[25] The Georgia Code of

Professional Responsibility (the "Georgia Code"), in effect at the time that Munson

_____

Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule." Schlumberger Techs., Inc. v. Wiley, 113 F.3d 1553, 1561 (11th Cir. 1997).

[25]The United States Supreme Court has stated that a federal court can charge attorneys with knowledge of, and hold them accountable to, state ethics rules in the state where the court sits. See In re Snyder, 472 U.S. 634, 645 n.6, 105 S. Ct. 2874, 2881 n.6 (1985) ("The Court of Appeals was entitled . . . to charge petitioner with the knowledge of and the duty to conform to the state code of professional responsibility. The uniform first step for admission to any federal court is admission to a state court. The federal court is entitled to rely on the attorney's knowledge of the state code of professional conduct applicable in that state court . . . .").

filed the offensive documents,[26] provides:

> In adversary proceedings, clients are litigants and though ill feeling may exist between clients, such ill feeling should not influence a lawyer in his conduct, attitude, and demeanor towards opposing lawyers. A lawyer should not make unfair or derogatory personal reference to opposing counsel. Haranguing and offensive tactics by lawyers interfere with the orderly administration of justice and have no proper place in our legal system.

Georgia Code, EC 7-37 (1999); see also EC 7-38 (stating that "[a] lawyer should be courteous to opposing counsel"); cf. Georgia Rules, pmbl. ¶ 4 (2002) ("A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for . . . other lawyers."). Similarly, the Georgia Code states that an attorney should not "assert a position . . . or take other action on behalf of the client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another." Georgia Code, DR 7-102(A)(1); cf. Georgia Rule 3.1(a) (substantively identical to DR-7-102(A)(1) but made gender neutral); R. 4.4 (stating that "a lawyer shall not use means that have no substantial purpose other than to

---

[26]The Supreme Court of Georgia adopted the Georgia Rules of Professional Conduct (the "Georgia Rules") on 12 June 2000, thereby replacing the Georgia Code. The effective date of the Georgia Rules was 1 January 2001. Munson filed the five documents containing the offensive remarks in 1999, at which time the Georgia Code was in effect and governed her conduct. Thus, in our discussion of the Georgia ethics rules, we reference the Georgia Code. For the convenience of the reader, however, we also cite to comparable provisions in the Georgia Rules that are in effect at the present time.

embarrass, delay, or burden a third person").

The Middle District Standards of Conduct and the Georgia Code provisions that we have discussed were violated by Munson when she filed the five documents that contained (1) insulting remarks about opposing counsel's physical traits and demeanor, (2) comments that called into question opposing counsel's fitness as a member of the bar, (3) thinly veiled threats aimed at opposing counsel, (4) a racial slur, and (5) unsubstantiated claims that opposing counsel was a racist.[27] The fact that Munson violated the applicable ethics rules not once, but on

_____

[27]This case is dissimilar from In re Snyder, a Supreme Court case in which an attorney was suspended from practice after writing a letter, deemed uncivil and rude in tone, to a district court judge's secretary that criticized the unfairness of the Criminal Justice Act. 472 U.S. 634, 105 S. Ct. 2874. The Supreme Court reversed the suspension, noting that the letter contained bona fide criticism of the Act, as evidenced by the fact that "[t]he Court of Appeals acknowledged that petitioner brought to light concerns about the administration of the plan that had 'merit,' and the court instituted a study of the administration of the Criminal Justice Act as a result of petitioner's complaint." Id. at 646, 105 S. Ct. at 2882 (internal citation omitted). The Court further stated that, even if the letter exhibited "unlawyerlike rudeness, a single incident of rudeness or lack of professional courtesy — in this context — does not support" suspension. Id. at 647, 105 S. Ct. at 2882.

Munson's conduct rises above the level of mere "unlawyerlike rudeness" and differs dramatically from the lawyer's conduct in Snyder. First, unlike the lawyer in that case, who criticized a particular statute and whose criticisms were found to have merit, Munson levied a series of personal attacks against opposing counsel which the district court found to be devoid of merit. Snyder involved legitimate criticism of a statute levied in a rude tone; the present case involves the systemic *harassment* of another attorney. Second, the Supreme Court in Snyder stated that the case involved only one instance of rudeness, while as Munson has exhibited a pattern of harassing conduct that is reflected in not one, but several, documents filed with the district court.

Similarly, the present case differs from In re Finkelstein, which involved an attorney who was suspended from practice for writing a rude letter to defense counsel in attempting to negotiate a settlement. 901 F.2d 1560 (11th Cir. 1990). In sanctioning the attorney, the district court disclaimed any reliance on written ethics rules and instead stated that he was suspending the attorney based on a "code by which an attorney practices which transcends any written code

repeated occasions, further buttresses our conclusion that the district court acted

appropriately in invoking its inherent power to sanction Munson.

Furthermore, in reaching our conclusion that sanctions were appropriate, we

note that Munson cannot justify her offensive conduct, as she has tried to do, by

making bareboned assertions that opposing counsel had unclean hands because he

acted with racial animus towards Thomas and the plaintiff witnesses.  Even if we

were to assume that opposing counsel's conduct towards Thomas and the other

witnesses was racist,[28] Munson still would not be justified in filing documents that

of professional conduct." Id. at 1565 (internal quotations omitted).  We reversed the suspension, explaining that "[t]he fatal flaw with this transcendental code of conduct is that it existed only in the subjective opinion of the court, of which appellant had no notice, and was the sole basis of the sanction administered *after* the conduct had occurred." Id. (emphasis in original).  Furthermore, we pointed out that reasonable attorneys could disagree over whether the attorney's letter exhibited unprofessional rudeness and uncivility, as illustrated by the affidavits of four attorneys that had been filed in response to the district court's show cause order. Id.

In contrast to the situation in Finkelstein, Munson's conduct, as we have explained, violated several written ethics provisions contained in the Middle District Standards of Conduct and the Georgia Code.  All attorneys practicing in the Middle District, moreover, are on notice that these written rules apply to their conduct and that violations can lead to sanction. See Middle Dist. R. 83.2.1(A) (cited *supra* note 24); R. 83.2.1(B) ("Discipline for misconduct defined in these rules may consist of (a) disbarment, (b) suspension, (c) reprimand, (d) monetary sanctions, (e) removal from this Court's roster of attorneys eligible for practice before this Court, or (f) any other sanction the Court may deem appropriate").  In addition, unlike in Finkelstein, Munson has failed to come forward with any evidence, affidavits or otherwise, in response to the Show Cause Order to demonstrate that a reasonable attorney would approve of her behavior towards opposing counsel.  Finally, we note that Finkelstein involved disqualification of an attorney from practicing before a court — a much more severe sanction than the reprimand that occurred here — and thus required a more particularized finding of misconduct by the district court than is required in the reprimand context. See supra note 24.

[28]Although provided with ample opportunity to demonstrate otherwise, Munson has failed to articulate any reasonably specific facts from the record that suggest that opposing counsel conducted himself in a racially discriminatory manner towards Thomas and the plaintiff

37

do not simply relate facts, but instead overflow with personal insults that obviously are calculated to harass and intimidate opposing counsel. If opposing counsel was conducting himself in an inappropriate manner during discovery, the proper course was for Munson to seek a protective order under Federal Rule of Civil Procedure 26(c), which she manifestly failed to do in this case, not to resort to the slinging of insults *ex post* in documents submitted for summary judgment purposes. Affidavits, declarations, and other submissions to the court serve as a vehicle for the articulation of specific facts that support a particular position relevant to a case. Such submissions, however, are not meant to be an avenue through which attorneys, clients, and witnesses can simply emote, let off steam, or otherwise sling mud at an adversary.

Yet Munson's position is that, even if offensive remarks were contained in her submissions to the district court, the remarks were those of her client and of other plaintiff witnesses, not her own. Specifically, she contends that the remarks contained in the Thomas and Blair affidavits and the Mercer declaration are

_____

witnesses. Rather, Munson repeatedly has filed documents that baldly declare that opposing counsel is a racist and that contain generalized, conclusory remarks that his behavior during the litigation was motivated by racial animus. Indeed, the Thomas and Blair affidavits, as well as the Mercer declaration, simply assume that opposing counsel's motives for his tough questioning of deponents was racial animus, without coming forward with specific examples to show that racism was involved. Such race-baiting serves no purpose other than to disrupt proceedings and to harass opposing counsel.

attributable solely to those individuals. Her argument is that the remarks cannot be imputed to her based on the mere act of her filing such documents with the court. Thus, Munson concludes, the district court erred by holding her responsible for the remarks contained in the affidavits and the declaration, given the fact that the court did not first hold an evidentiary hearing, and given the fact that the court did not make a specific factual finding that she drafted the documents or that she counseled the affiants and the declarant to insert the offensive remarks.

Munson suggests that a contrary result would place on attorneys a duty to inspect affidavits and declarations, which she asserts is contrary to the ethics rules: "Counsel are not afforded the luxury of 'policing witnesses' perceptions' or disregarding valid evidence helpful to their client's case even if that evidence contains the affiants' perceptions and/or opinions that the district court or the opposing counsel may have found offensive." Munson Appellant Br. at 8. Otherwise, she maintains, an attorney would be placed in an adversarial position *vis a vis* his or her client because the attorney would be forced to disregard entire affidavits or declarations that may contain facts central to his or her client's case. This, in turn, would interfere with the attorney's duty of loyalty to his or her client, in Munson's view.

We reject Munson's argument. As an initial matter, we point out that in her

39

appellant brief, Munson directs her attention to the remarks aimed at opposing counsel that were contained in the Thomas and Blair affidavits and in the Thomas declaration. She ignores the fact that the district court also sanctioned her for comments she herself made in the Plaintiff's Amended Supplement and in footnote 2 of the Plaintiff's Response to Defendant's Motion to Exclude. Case law is replete with instances where an attorney has been sanctioned for his or her own unsubstantiated accusations and demeaning, condescending, and harassing comments directed at opposing counsel,[29] and such accusations and comments are

---

[29]See, e.g., In re First City Bancorporation of Texas, Inc., 282 F.3d 864, 866 (5th Cir. 2002) (per curiam) (upholding imposition of fine upon attorney who, among other things, characterized other attorneys as "various incompetents" and as "stooges") (internal quotations omitted); In re Cordova-Gonzalez, 996 F.2d 1334, 1336 (1st Cir. 1993) (per curiam) (upholding disbarment of attorney from practicing before district court, as well as disbarring attorney from practicing before the court of appeals, in part because attorney made "vitriolic and, as far as the record shows, unfounded personal assaults" upon the judge and opposing counsel in the pleadings); Lee v. American Eagle Airlines, Inc., 93 F. Supp. 2d 1322, 1325 (S.D. Fla. 2000) (reducing attorney's fees award to two plaintiff's attorneys in part because of belligerent comments directed at opposing counsel, such as by calling the counsel a "Second Rate Loser") (internal quotations omitted); United States v. Kouri-Perez, 8 F. Supp. 2d 133 (D. P.R. 1998) (reprimanding and fining defense attorney who, among other things, filed motion papers containing accusations that the Assistant United States Attorney was the granddaughter of a former Dominican Republic dictator); In re Plaza Hotel Corp., 111 B.R. 882 (Bankr. E.D. Cal. 1990) (disqualifying attorney from representing debtor in part because attorney made sexist comments to attorney representing the United States trustee); Attorney Grievance Comm'n v. Alison, 565 A.2d 660, 664 (Md. 1989) (suspending attorney whose misconduct included referring to opposing counsel's argument as "particularly absurd" and who referred to the attorney as a "son of a bitch") (internal quotations omitted); Mullaney v. Aude, 730 A.2d 759 (Md. Ct. Spec. App. 1999) (holding that protective order could be issued and attorney's fees awarded based on sexist comments made by one attorney to another during deposition); In re Williams, 414 N.W.2d 394 (Minn. 1987) (per curiam) (upholding public reprimand of attorney who, among other things, made an anti-semitic comment to opposing counsel during a pretrial deposition); In re Vincenti, 554 A.2d 470 (N.J. 1989) (per curiam) (suspending attorney whose misconduct included challenging opposing counsel to a fight and who made profane and racist

40

present in these two documents written and filed by Munson. Thus, irrespective of whether Munson can be held responsible for the offensive remarks contained in the affidavits and declaration, the sanctions imposed still were appropriate based on her own written remarks contained in the Plaintiff's Amended Supplement and in footnote 2 of the Plaintiff's Response to Defendant's Motion to Exclude.

In addition, we reject Munson's assertion that, because she only filed the documents with the district court, she cannot be held responsible for the offensive remarks contained in the Thomas and Blair affidavits and the Mercer declaration. Accordingly, we also reject her assertion that the district court, before holding her responsible for the affidavits and the declaration, had to hold an evidentiary hearing and had to make a specific factual finding either that she drafted the offensive remarks, or that she counseled the affiants and the declarant to insert the remarks into the submitted documents. DR 7-102(A)(1) of the Georgia Code makes clear that an attorney cannot "assert a position . . . *or take other action on behalf of his client* when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another." Georgia Code DR 7-102(A)(1) (emphasis added); <u>cf.</u> Georgia Rule 3.1(a) (substantively identical to DR

---

remarks about opposing counsel); <u>In re Eisenberg</u>, 423 N.W.2d 867, 870 (Wis. 1988) (per curiam) (suspending attorney from practice in part for calling prosecutor, among other things, a "dummy"and stating to the prosecutor, "[Y]ou don't even know what you are talking about or what you are doing in this courtroom").

41

7-102(A)(1) but made gender neutral). "Other action on behalf of his client" is a

broad, catch-all phrase, and it surely includes within its ambit the filing of

affidavits or declarations. It follows, then, that DR 7-102(A)(1) prohibits an

attorney from submitting to the court affidavits or declarations when it is obvious

that the documents contain remarks that serve merely to harass another, as was the

case with the Thomas and Blair affidavits and the Mercer declaration. Munson's

position, therefore, is contradicted by DR 7-102(A)(1) of the Georgia Code.[30]

Moreover, we reject Munson's position because, if we were to accept her

reasoning, we would be endorsing a passive role for attorneys with respect to

filings made with a court. An attorney should not be an unreflecting conduit

through which the opinions or desires of a client or witness are permitted to flow

unchecked. As the Georgia ethics rules indicate, an attorney has a duty to

"exercise independent professional judgment." Georgia Code Canon 5

(capitalization and italics omitted); cf. Georgia Rule 2.1 (same). Independent

---

[30]Although the district court did not rely on Federal Rule of Civil Procedure 11 to impose sanctions upon Munson, we note that Munson's position concerning the filing of affidavits and declarations is inconsistent with that rule, which states in part:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Fed. R. Civ. P. 11(b)(1).

42

judgment is an essential ingredient of good lawyering, since attorneys have duties not only to their clients, but also, as officers of the court, to the "system of justice" as a whole. Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1546 (11th Cir. 1993) ("All attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice. An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly."). Given this duty, it follows that an attorney cannot "file first and think later," In re TCI Ltd., 769 F.2d 441, 442 (7th Cir. 1985), thereby neglecting to employ his or her independent professional judgment to consider the plausibility and the appropriateness of what is asserted in the filed document.

Furthermore, with respect to an attorney's relationship with his or her client, "[i]t has been noted that an attorney is not merely the client's alter ego functioning only as the client's mouthpiece." Morrison v. State, 373 S.E.2d 506, 509 (Ga. 1988) (internal quotations omitted). Even though the client has decision making authority regarding the objectives of the representation, the client's attorney can pursue those objectives only through lawful and ethical means. See Georgia Code DR 7-101(A)(1) (stating that an attorney can pursue "the lawful objectives of his client through reasonably available means permitted by law and the [ethics] [r]ules"); cf. Georgia Rule 1.3 cmt. 1 (providing that "[a] lawyer . . . may take

43

whatever lawful and ethical measures are required to vindicate a client's cause or

endeavor"). Consequently, an attorney cannot silently acquiesce to a client who

demands that the attorney pursue measures in the litigation that conflict with

applicable ethics provisions.[31] Rather, the attorney must stand his or her ground

and refuse to act in a manner that flies in the face of the relevant ethics rules. And,

if the foregoing is true with respect to a client, it is even more true with respect to a

witness, to whom the attorney does not owe a duty of loyalty. Thus, in the present

case, Munson cannot shield herself from sanctions by asserting that her role was

---

[31]Several other Georgia Code provisions indicate that an attorney cannot escape sanction by claiming that he or she was just following the orders of the client. See, e.g., Georgia Code DR 1-102(A)(1)&(2) (stating that an attorney shall not "violate a Disciplinary Rule" or "circumvent a Disciplinary Rule through actions of another"); DR 2-110(B)(1)&(2) (stating that a lawyer "shall withdraw from employment, if . . . he knows or it is obvious that his client is bringing the legal action, conducting the defense, or asserting a position in the litigation, or is otherwise having steps taken for him, merely for the purpose of harassing or maliciously injuring any person [or if] he knows or it is obvious that his continued employment will result in violation of a Disciplinary Rule"); DR 7-102(A)(3)-(5) (providing that an attorney cannot "conceal or knowingly fail to disclose that which he is required by law to reveal," "knowingly use perjured testimony or false evidence," or "knowingly make a false statement of law or fact").

The same is true with respect to the Georgia Rules. See, e.g., Georgia Rule 1.2(e) ("When a lawyer knows that a client expects assistance not permitted by the rules of professional conduct or other law, the lawyer shall consult with the client regarding the relevant limitations on the lawyer's conduct."); R. 1.16(a)(1) (stating that "a lawyer shall not represent a client, or where representation has commenced, shall withdraw from the representation of a client if . . . the representation will result in violation of the Georgia Rules of Professional Conduct or other law"); R.3.3 (a)(2)("A lawyer shall not knowingly . . . fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client"); R. 4.1(b) ("In the course of representing a client a lawyer shall not knowingly . . . fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by" the attorney-client confidentiality rule); R. 8.4(a)(1) (noting that it is a violation of the ethics rules "for a lawyer to . . . violate or attempt to violate the Georgia Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another").

merely the passive one of filing the affidavits and the declaration with the district court. By filing the documents containing remarks that served no purpose other than to harass and intimidate opposing counsel, Munson at best silently acquiesced to litigation tactics that flew in the face of baseline professional norms.

Based on these considerations, we decide that Munson could be sanctioned under the district court's inherent power[32] not only for the Plaintiff's Amended Supplement and footnote 2 of the Plaintiff's Response to Defendant's Motion to Exclude, but also for paragraph 12 of the Thomas affidavit, paragraph 5 of the

---

[32]We also note that, as an alternative to a district court's inherent power, several federal provisions provide possible avenues for imposing sanctions upon errant attorneys who harass other attorneys during the course of litigation. See, e.g., 28 U.S.C. § 1927 ("Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."); Fed. R. Civ. P. 11(b)(1) ("By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."); Fed. R. Civ. P. 56(g) (providing that "[s]hould it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this [summary judgment] rule are presented in bad faith[,] . . . any offending party or attorney may be adjudged guilty of contempt."). That sanctions may have been possible under these provisions, however, did not negate the district court's inherent power to levy sanctions against Munson for her misconduct. The "inherent power [to sanction errant lawyers] can be invoked even if procedural rules exist which sanction the same conduct." Chambers, 501 U.S. at 49, 111 S. Ct. at 2135; see also In re Mroz, 65 F.3d at 1575 ("The fact that rules such as Rule 11 and Bankruptcy Rule 9011 have been promulgated by Congress does not displace a court's inherent power to impose sanctions for a parties' bad faith conduct."). Indeed, "[t]he inherent power to sanction is both broader and narrower than . . . other means of imposing sanctions." In re Mroz, 65 F.3d at 1575.

Blair affidavit, and the Mercer declaration. Under the circumstances here, Munson's conduct "cross[ed] the line from passionate advocacy . . . into sanctionable conduct evincing bad faith." In re 60 E. 80th St. Equities, Inc., 218 F.3d 109, 117 (2d Cir. 2000). The district court acted well within its discretion in formally censuring and reprimanding Munson. The court also acted properly in stating that any future documents filed by Munson that were found, after notice and an opportunity to be heard, to contain such remarks would be stricken without an opportunity to amend or withdraw.[33]

B. The Recusal Issue

In her appellant brief, Munson also argues that the district judge was racially biased against her and thus should have recused himself under 28 U.S.C. § 455. Accordingly, she contends on appeal that the judge abused his discretion by denying her recusal motion. As evidence for her claim of racial bias, Munson asserts that the sanctions order itself contains language that demonstrates the judge's bias. Indeed, Munson's position is that the district judge "assumed a stance as a protectorate of white America" in the sanctions order. Munson Appellant Br. at 4. She points to the fact that the judge stated that she has an

---

[33]Having reviewed the remaining arguments that Munson raises concerning the sanctions issue, we conclude that they are without merit.

46

"inexplicable hypersensitivity to racial differences," R4-119-1, and to the fact that the judge stated that "[a]n unfounded accusation of racism is the modern equivalent of 'fighting words' intended to defame and hold up to public ridicule." Id. at 2. Such remarks by the district judge, Munson maintains, demonstrate why his recusal was necessary.[34]

Under 28 U.S.C. § 455(a), a district judge must recuse himself "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "Under § 455, the standard is whether an objective, fully informed lay observer would entertain significant doubt about the judge's impartiality." Christo v. Padgett, 223 F.3d 1324, 1333 (11th Cir. 2000), cert. denied, 531 U.S. 1191, 121 S. Ct. 1190 (2001). Furthermore, "[t]he general rule is that bias sufficient to disqualify a judge must stem from extrajudicial sources." Hamm v. Board of Regents, 708 F.2d 647, 651 (11th Cir. 1983). The exception to this rule is "when a

---

[34]In her appellant brief, Munson requests, among other things, that we disqualify the district judge from hearing any other race discrimination case in which she appears as counsel, and "from hearing race employment discrimination cases in which [there are] accusations of racism against white individuals or corporations owned and/or managed by whites." Munson Appellant Br. at 5. As to the former request concerning other cases in which Munson appears as counsel, the request is not ripe. See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1315 (11th Cir. 2000) ("[T]he ripeness doctrine prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.") (internal quotations omitted). As to the latter request concerning race discrimination cases involving other civil rights attorneys, Munson has no standing to seek disqualification of the district judge in such cases. See Florida Right to Life, Inc. v. Lamar, 273 F.3d 1318, 1322 (11th Cir. 2001) (noting that there are "strict requirements" for when one party can assert the rights of another and that this occurs only in "rare circumstances").

judge's remarks in a judicial context demonstrate such pervasive bias and prejudice that it constitutes bias against a party." Id. Mere "friction between the court and counsel," however, is not enough to demonstrate "pervasive bias." Id.

In light of these principles and the record before us, we reject Munson's argument that the district judge should have recused himself in response to her recusal motion. Indeed, we find no conceivable basis in the record for Munson's accusation of bias on the part of the judge. We first address the statement by the district judge that there was no explanation for Munson's repeated attacks upon defense counsel other an "inexplicable hypersensitivity to racial differences." R4-119-1. In making the statement, the judge was pointing out that Munson made repeated vitriolic accusations in the five submitted documents that opposing counsel was racist, even though there was nothing in the record that substantiated such accusations. In referring to Munson's "hypersensitivity," moreover, the district judge was calling attention to the fact that, throughout the litigation, Munson's propensity was to blame every legal setback she and her client experienced on the race of either opposing counsel or the judge. Such statements do not reflect racial bias on the part of the district judge, but rather the judge's assessment, which we view as accurate, of Munson's offensive behavior throughout the course of proceedings. If the district judge was at times emphatic

48

in tone, it merely reflects the judge's exasperation with Munson's pattern of rude and unprofessional conduct. Even if such exasperation could be characterized as "friction between the court and counsel," such friction, as we have pointed out, is not enough to show "pervasive bias" warranting recusal. Hamm, 708 F.2d at 651.

We next address whether the district judge's statement that "unfounded accusation[s] of racism" are "the modern equivalent of 'fighting words'" shows that he is racist. R4-119-2. The statement, we conclude, certainly does not reflect racial bias on the part of the judge. In the statement, the district judge was pointing out that, in the twenty-first century, individuals take allegations of racism very seriously. The reference to "fighting words" is meant to show that, because allegations of racism are taken so seriously in our society, allegations that are baseless — thereby serving only a frivolous or harassing purpose — are particularly offensive and provoke a strong response from the person accused, given the huge reputational costs involved. Such a statement in no way indicates that the district judge was biased against Munson or her client, or that the judge was biased against civil rights plaintiffs in general. In fact, the statement shows nothing more than that the district judge was conscious of the implications of being labeled racist in our society. The judge's statement falls far short of what would be necessary to demonstrate pervasive bias on the part of the judge towards Munson.

Additionally, we point out that other actions of the district judge point to his objectivity and neutrality throughout this case. For instance, we note that, with regard to the sanctions levied against Munson, the judge imposed a relatively mild form of sanction by formally censuring and reprimanding her, and by ordering her not to include similarly offensive comments in future submissions to the court. The district judge imposed this mild sanction, despite the fact that Munson had attacked the judge's integrity repeatedly in documents she filed with the court. This indicates that the district judge remained neutral and objective, even though he himself had been subjected to personal attack. We also note that the judge exhibited his objectivity when, after issuing the sanctions order, he denied Tenneco's request for attorney's fees. In the order denying attorney's fees, he stated the following:

> [T]his Court cannot say that Plaintiff's claims were so seriously lacking in arguable merit as to warrant an award of attorney's fees. Although the Court found that Plaintiff had failed to satisfy a prima facie case because he failed to demonstrate that he was qualified for the promotion he sought, the question was not easily resolved. Thus, the question of whether Plaintiff satisfied a prima facie case had arguable merit. Furthermore, Plaintiff's failure to provide direct evidence of discrimination, as found by the Court in its Order, provides no basis for a finding that the claim was meritless.

Supp. R1-131-3. Despite Munson's offensive conduct, the district judge remained

50

impartial about the claims of her client and refused to grant attorney's fees to Tenneco. Such actions by the district judge belie Munson's allegation that the judge should have recused himself due to racial bias, and such actions only further demonstrate that her recusal argument is unpersuasive. Accordingly, we reject Munson's contention that the district judge abused his discretion in refusing to grant her recusal motion.

### III. CONCLUSION

This appeal ensued after the district court, pursuant to its inherent power, sanctioned Ethel L. Munson for submitting five documents to the court that contained *ad hominem* attacks upon opposing counsel. Specifically, the district court sanctioned Munson for remarks contained in paragraph 12 of the Thomas affidavit, paragraph 5 of the Blair affidavit, the Plaintiff's Amended Supplement, the Mercer declaration, and footnote 2 of the Plaintiff's Response to Defendant's Motion to Exclude. In this appeal, we have decided that the district court did not abuse its discretion by invoking its inherent powers and sanctioning Munson for the submissions. The documents contained: insulting remarks about defense counsel's physical traits and demeanor; remarks that called into question defense counsel's fitness as a member of the bar; thinly veiled physical threats directed at defense counsel; a racial slur; and unsubstantiated claims that defense counsel was

a racist. We have ruled that Munson's filing of documents to the district court that contained such remarks evinced bad faith on her part. In so ruling, we have explained how Munson's filing of the five documents violated the Middle District Standards of Conduct and the applicable Georgia ethics rules. We have decided, in addition, that the district judge acted properly by denying Munson's recusal motion, given that Munson has failed to present any evidence that would suggest that the judge exhibited pervasive bias towards her.

In conclusion, we point out that, in her appellant brief, Munson has made insulting and demeaning remarks about the district judge, such as by calling him "a protectorate of white America." Munson Appellant Br. at 4. At times, the line between legitimate criticism and insult can be a blurry one, but Munson has exhibited a pattern of baseless accusations and invective in this case that is nowhere near that line. In future submissions to this court, we direct Munson to Rule 1(a) of Addendum 8 to the Eleventh Circuit Rules, "Standards for Professional Conduct," applicable to all attorneys who practice before us.[35] Future

---

[35]Rule 1(a) of Addendum 8 provides:
> An act or omission of an attorney admitted to practice before the Court, committed individually or in concert with any other person or persons, that violates the Code of Professional Responsibility or Rules of Professional Conduct adopted by this Court, shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship. Except as otherwise provided by a specific rule

submissions to this court by Munson that contain accusations or comments that have no basis in fact and that serve only a harassing or frivolous purpose — whether aimed at a district judge, opposing counsel, or any other individuals involved in a given case — will not be tolerated and will be cause for severe sanction.  See U.S. Ct. of App. 11th Cir. Rules, Addendum 8, R. 1(B).[36]

**AFFIRMED.**

---

of the Court, attorneys practicing before the Court shall be governed by the Federal Rules of Appellate Procedure, the Court's local rules, the American Bar Association Model Rules of Professional Conduct, and the rules of professional conduct adopted by the highest court of the state(s) in which the attorney is admitted to practice to the extent that those state rules are not inconsistent with the American Bar Association Model Rules of Professional Conduct, in which case the model rules shall govern.

U.S. Ct. of App. 11th Cir. Rules, Addendum 8, R. 1(A).

[36]Rule 1(B) provides:
Discipline for misconduct defined in these rules may consist of disbarment, suspension, reprimand, monetary sanctions (including payment of the costs of disciplinary proceedings), removal from district court Criminal Justice Act panels, removal from the Court's roster of attorneys eligible for practice before the Court and for appointment under the Criminal Justice Act, or any other sanction the Court may deem appropriate.

U.S. Ct. of App. 11th Cir. Rules, Addendum 8, R. 1(B).